**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Tommy CLARK, Defendant-Appellant.**

**No. 40628.**

Missouri Court of Appeals,
Eastern District,
Division Two.

March 18, 1980.

David V. Bear, Bear, Hines & Thomas, Columbia, for defendant-appellant.

John Ashcroft, Atty. Gen., Paul Robert Otto, Steven D. Steinhilber, Asst. Attys.

Gen., Jefferson City, for plaintiff-respondent.

KELLY, Chief Judge.

Appellant, Tommy Clark, was convicted in the Circuit Court of Audrain County of aiding and abetting Viola Clark, his former wife, between December 1, 1976, and May 1, 1977, in the concealment of an event required to be reported by law and regulation of the State of Missouri and the United States relating to public assistance, to-wit, the return of a parent to the home, § 205.-967(2) RSMo. (1975 Supp.), and was sentenced to a term of three months imprisonment in the Audrain County Jail and fined a sum of $1,000.00 in accord with the jury verdict. He has appealed this conviction and seeks a reversal thereof and discharge from said charge or, in the alternative, a new trial. For reasons hereinafter set out we reverse the conviction and remand the cause to the trial court with instructions.

On appeal the appellant presents five Points Relied On which he contends entitles him to the relief prayed for. Because of the decision we have reached we find it necessary to consider only one of these, i. e. whether the trial court erred in denying his motion for a judgment of acquittal at the close of all of the evidence because there was no evidence adduced by the state to prove beyond a reasonable doubt that (1) he knew the principal in the first degree was concealing or failing to report his presence, (2) he knew her failure to report his presence in the home was unlawful, and (3) he committed any physical or verbal affirmative act which aided or abetted her in any manner in her failure to report to the welfare authorities his return to the home.

In reviewing the evidence in light of general principles applicable to courts of appeal we are not unmindful of the rule that in determining whether there is sufficient evidence to support a criminal conviction, a reviewing court considers as true the evidence most favorable to the state and that all favorable inferences reasonably to be drawn from the evidence must be indulged in to support the conviction. Our review of the evidence is limited to a determination whether substantial evidence supports the verdict of the jury and our function is not to substitute our judgment for that of the jury. We determine only whether the evidence is sufficiently substantial to make a submissible case. Substantial evidence means evidence from which the trier of facts could find the issue in harmony therewith. We do not weigh the evidence. *State v. Longmeyer*, 566 S.W.2d 496, 499[1–4] (Mo.App.1978).

The evidence, viewed in this light,[1] is that appellant and Viola Clark (hereinafter Viola) were married in June, 1969. Appellant had a minor son by a former marriage and two children, both sons, were born of his

---

1. One problem with the evidence developed through the testimony of the state's witnesses is the general nature of the questions propounded; there was an utter failure to limit the time to the period covered by the Information; examples of this are:

"Q. (By Ms. McPherson—the prosecuting attorney) Was Mr. Clark aware that you were on welfare?

A. (By Witness) Yes, he was.

Q. And how was he aware of this fact?

A. Well, shortly before I left the State, he told me that I could go off welfare and he would take care of me. After the birth of my children, he didn't receive any bills from the hospital saying that he had to pay for the birth of the children. It had to be paid from somewhere.

Q. Did you ever ask him for money?

A. Yes, I did.

Q. What did he say with regard to that?

A. If it were around the first of the month, he would say, you know, 'You just got your check; use it.'"

Viola testified that she left the state in September, 1977, a period of time after the time frame of the alleged charge.

\* \* \* \* \* \*

"Q. (By Ms. McPherson) Were you aware that if you reported Tommy Clark as having returned to the home that you would lose your welfare grant?

A. I knew that.

Q. And during this period of time, did Tommy Clark ever do anything with any of the checks or cash them?

A. *In February of 1976*, I was in the hospital and he brought one of my checks to the hospital. I signed it and he had to co-sign it in order to cash it." (Emphasis supplied).

marriage with Viola. When the boys were born was not developed in the transcript of the record, other than Viola's testimony that they were born during the time she was on welfare. Sometime in 1973 Viola went on welfare, ADC. The expenses of the birth of both of the children were paid for by Medicaid. At all times relevant to the charge involved in this case Viola and the three children resided in "urban renewal public housing" at 915 Garfield, Mexico, Missouri. She alone signed the lease for these premises and paid the $26.00 monthly rent to occupy them.

Viola continued drawing welfare, ADC, based upon appellant's continued absence from the home, until sometime in February, 1976, when she went to the prosecuting attorney's office to seek a non-support warrant against appellant. When she told the prosecuting attorney that appellant "was in and out" of the house the prosecuting attorney advised her that she had discovered that appellant was living in the home and for Viola to avoid felony proceedings she should divorce the appellant and "go off welfare."

Viola divorced appellant on April 6, 1976, and went off welfare between February, 1976, and June, 1976. Appellant left the home on Garfield following the divorce but returned there sometime in August or September of 1976. Between December 1, 1976, and May 1, 1977, appellant "resided" with Viola at 915 Garfield with his three sons. He wasn't there every evening, but often. He would have dinner there three or four nights a week, and on occasion stayed all night and slept with Viola. He kept some of his clothing and personal belongings, including "guns and things like that," in the home. She washed his clothes and cooked his meals. She told him why he couldn't live there in February, 1976, after she had talked with the prosecuting attorney, and also told him at that time why she was divorcing him, but he ignored her and came and went as he wanted.

Viola admitted that appellant never told her not to report his presence in the home nor did he tell her to keep it a secret.

According to her testimony appellant wasn't willing to put enough money into the home for her to sustain the children and because he did not give her enough money to take care of his children she had to get it somewhere so she turned to ADC. This is how he encouraged her not to report his presence in the home.

There was other evidence by an investigator of the prosecuting attorney's office that he observed appellant entering and leaving the home at least three times during the period covered by the Information and that appellant kept two automobiles he owned, a 1973 Chrysler and a 1968 Dodge, near the 915 Garfield address between March 24, 1977, and April 4, 1977. At noon on the 23rd of March, 1977, appellant drove up in front of the house, got out of his car, and went inside the house without knocking on the door. This same investigator testified that on September 26, 1977, appellant stated to him that he had been living with Viola "more off than on" since the time of the divorce and, on a second occasion appellant told him that he had observed Viola and her sister carrying all of his meat out of the house. Later, in November of 1977, while interviewing the appellant in the presence of his counsel, appellant told him that he had lived with Viola at 915 Garfield all but a couple of weeks since the divorce.

Susan Lee Lowery, an income maintenance case worker of the Division of Family Services of Audrain County, testified that it was her responsibility to determine the eligibility of different clients and the eligibility of the different applicants for different assistance programs offered by the state. Viola was one of her clients. According to Ms. Lowery, she must reinvestigate every case at five to six month intervals by contacting the client and have the client fill out a set of forms concerning her eligibility to receive or to continue to receive welfare payments. Among the questions which must be answered are whether there has been a change of residence, whether anyone has come in or left the home, whether her income has changed, and whether her resources have changed. She identified three

documents as forms filled out by Viola on November 11, 1976, January 27, 1977 and May 4, 1977, respectively. Ms. Lowery also testified that she explains the form to the applicant and explains the penalties involved in receiving assistance if a person should make false statements and conceal information, and then she has the applicant sign the form after going over it with her. Each of these forms was signed by Viola. The three documents [2] were admitted into evidence as State's Exhibits 1, 2 and 3. Between December, 1976, and May, 1977, Viola was receiving $208.00 per month ADC, and between February and April, 1977, she received food stamps and Medicaid authorized under Missouri law. Viola did not report the return of appellant to the home during this period to Ms. Lowery.

Ms. Lowery further testified that during the period of December 1, 1976, and May 1, 1977, we "sent two letters to him [appellant] but he did not respond."

The appellant testified in his own behalf, and denied that he lived at 915 Garfield during the times charged in the Information. According to his testimony, he lived in Montgomery City, Missouri, during that time, in a house owned by his father and with another woman. He explained his presence in the home on Garfield by categorizing the times he was there as "visits" to his children and his former wife. He explained the presence of his Chrysler at the home on Garfield, testifying that Viola drove it while he drove the Dodge. During that period of time he was working as a truck driver for O'Brien's Transfer over the road and inter-state. At time of trial he was still so employed. On some trips he was gone for two or three weeks at a time; he'd go by and see the children and Viola when he got back in town. Sometimes he'd remain overnight. He left some of his clothing in the home on Garfield. He testified that he never discussed with Viola the matter of reporting his presence in her house. He further testified that he did not know how long she had been drawing a welfare check but found out about it when he came home and there was a check in the mailbox; he denied knowing how long she had been receiving such a check. He recalled taking the check to Viola while she was in the hospital and testified that he received none of the funds from that check. On cross-examination by use of a document which was not introduced into evidence, he admitted that he paid nothing for the birth of either of his children and that he had filed a motion in court saying that he didn't have to pay support for his children because they were living with him and he had made direct payments to plaintiff (Viola) and the minor children.[3]

To make a submissible case of aiding and abetting there must be some evidence that the defendant, in some fashion, associated himself with the venture or participated in the crime in some manner as something he wished to bring about or to make the offense succeed. *State v. Taylor*, 542 S.W.2d 91, 93[2] (Mo.App.1976). Mere presence at the scene of the crime is not enough. *State v. Castaldi*, 386 S.W.2d 392, 395[3] (Mo.1965). "Aiding or abetting," in the sense those words are used in criminal law, contemplate conduct calculated to incite, encourage or assist in the perpetration of a crime, and comprehend all assistance rendered by acts or words of encouragement, incitement or support in a criminal act, and involve some participation, either before or at the time the criminal act is committed. In order to "aid and abet" in the commission of a crime, it is necessary that a defendant associate himself in some way with the principal in bringing about the commission of a crime, and mere negative acquiescence is not sufficient. *State v. Muchnick*, 334 S.W.2d 386, 389[2, 3, 5] (Mo. App.1960).

2. While there were several documents introduced into evidence by the state we have not been favored with them inasmuch as they have not been filed in this court pursuant to Rule 81.15.

3. This is explained in the argument of the prosecutor as a motion to quash execution in the divorce case whereby the appellant sought to quash a garnishment and where he alleged that he had provided Viola and the children with support in a sum of $195.00 per month.

**752**

This case was tried as if the appellant was charged with "welfare fraud," a term used frequently by the prosecutor throughout the trial. The crime charged here only incidentally had anything to do with the receipt of welfare payments by the appellant's former wife. Even if there had been proof that appellant knew Viola was receiving ADC between December 1, 1976, and May 1, 1977, we come to the conclusion that there was insufficient proof to make a submissible case of aiding and abetting her failure to report his presence in the home which is necessary to a conviction under the statute. The duty to report this change in circumstance was Viola's, not the appellant's. The statute places the duty on the one receiving the ADC payments to make this report and there is no evidence appellant received any ADC payments in the period charged in the Information. To convict the appellant as an aider and abettor it is necessary to prove that he did more than return to the home and that he stood by while Viola received ADC payments to which she might not be entitled. To prove the charge the state had to adduce evidence that appellant knew that it was against the law for Viola to receive ADC payments while he was in the home; that she was required under the law to report his presence in the home to the welfare authorities; and that he, with this knowledge, "aided and abetted" her in concealing or in not reporting his presence in the home.

There is simply no evidence that appellant possessed any knowledge that Viola was under a duty to report his return to the house on 915 Garfield. The prosecutor failed to develop just what it was Viola told appellant in February, 1976, about why he had to leave the home, and more critically, that if he returned to the home at any time thereafter, she was under a duty to report that fact to the welfare authorities. Neither is there any evidence appellant gained this knowledge from any source. "Mere suspicion, however strong, will not supply the place of evidence when life or liberty is at stake." *State v. Jones*, 106 Mo. 302, 17 S.W. 366, 369 (1891).

The state failed to make a submissible case of a violation of § 205.967(2) RSMo. (1975 Supp.).

Since we hold that there was insufficient evidence to support the appellant's conviction, the state may not enjoy a second opportunity to present further evidence, if any there is, which would support the charge. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *State v. Basham*, 568 S.W.2d 518, 521(3) (Mo. banc 1978).

The judgment of conviction of appellant is reversed and remanded to the trial court with directions to dismiss the Information in this cause and to enter an order discharging him.

STEPHAN, P. J., and STEWART, J., concur.