**STATE of Missouri, Respondent,**

v.

**Ivron BUTLER, Appellant.**

**No. WD 53344.**

Missouri Court of Appeals, Western District.

March 21, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 2, 2000.

Application for Transfer Denied Aug. 29, 2000.

Kevin L. Jamison, Gladstone, for appellant.

Jeremiah (Jay) Nixon, Atty. Gen., Cheryl A. Caponegro, Asst. Atty. Gen., for respondent.

Before BRECKENRIDGE, Chief Judge, LOWENSTEIN, ULRICH, SPINDEN, SMART, ELLIS, LAURA DENVIR STITH, EDWIN H. SMITH, RIEDERER,[1] Judges, and KENNEDY and HANNA, Senior Judges.

PER CURIAM.

Seven judges concur in affirming the judgment of the circuit court. Accordingly, the judgment of the circuit court is affirmed.

LOWENSTEIN, J., concurs in separate opinion filed, in which HANNA, Sr.J., concurs.

SPINDEN, J., concurs in separate opinion filed, in which SMART, J., concurs.

BRECKENRIDGE, C.J., concurs in separate opinion filed, in which ULRICH and EDWIN H. SMITH, JJ., concur.

LAURA DENVIR STITH, J., dissents in separate opinion filed, in which ELLIS, J., and KENNEDY, Sr.J., concur.

ELLIS, J., dissents in separate opinion filed, in which LAURA DENVIR STITH, J., concurs.

LOWENSTEIN, Judge, concurring.

A jury convicted Ivron Butler of forcible sodomy, § 566.060, RSMo Cum.Supp.1993, felonious restraint, § 565.120, RSMo 1994, and two counts of armed criminal action, § 571.015, RSMo 1994. Mr. Butler was found to be a prior and persistent offender under §§ 558.016 and 557.036, RSMo 1994, and was sentenced accordingly to consecutive terms of life imprisonment for forcible sodomy, § 566.060.2, RSMo Cum.Supp. 1993, seven years for felonious restraint, § 558.011.1(3), RSMo Cum.Supp.1993, and

100 years each for the two counts of armed criminal action, § 571.015.1, RSMo 1994. On appeal, the defendant claims that the court erred in denying his motion for a mistrial because the court allowed evidence of uncharged crimes, in submitting the jury instruction on armed criminal action, and finally, "in denying [his] motion for judgment of acquittal on the grounds of insufficient evidence."

## Factual and Procedural Background

On August 31, 1993, at approximately 9:30 P.M., two boys, sixteen-year-old J.L. and thirteen-year-old N.E., were sitting idly by a lake and boat storage area at the Lakeview Terrace Mobile Home Court in Clay County, where they both lived. An individual, dressed in a T-shirt and shorts, walked by the boat storage area several times and asked the boys if they had seen someone waiting around who was supposed to help him take his boat out of storage. When the boys told him they had not seen anyone, he offered them some money to help him get his boat ready to take to the lake. The boys agreed. The man, who was the perpetrator of the crimes, said that he had to go home to get the combination to unlock the boat storage gate. The perpetrator returned within a short period of time. On return, the perpetrator told the boys that he could not find the combination to the lock, but that he knew a spot where they could climb over the fence. The location where the fence was supposedly down was in the back of the boat storage area. It was a secluded area of the mobile home park. The perpetrator then directed the boys to that place, explaining that it would hide them so that no one would think they were breaking in.

The man followed J.L. and N.E. through a wooded area around the chain link fence which secured the boats stored there. As they were walking, he said, "Who is going to be the hero?" or "Don't be a hero." J.L. and N.E. turned around and saw a

---

1. Judge Riederer resigned from this court pri- or to the issuance of the opinion.

gun in the man's hand. He told the boys if they cooperated, they would be all right. He ordered J.L. to lie on top of N.E. He tied J.L.'s hands behind his back with a rope, moved him over on his stomach next to N.E., and then tied N.E.'s hands behind his back. J.L. asked what he was going to do, and the man explained in harsh, crude language what he intended to do. The man pulled down J.L.'s shorts and underwear and had anal intercourse with J.L.

Neither boy got a good look at the assailant.[1] N.E. tried twice to look at the man's face, however, the man pushed N.E.'s head down and told him to turn his head. While the man was still sodomizing J.L., N.E. jumped to his feet and ran. N.E. ran even though the assailant grabbed his shirt and threatened to shoot him if he did not stop. After a brief chase, the man came back, untied J.L., and ran in the opposite direction.

N.E. ran into a street where he saw another friend whose father was a police officer. His friend's father called the police. J.L. ran to his own home and the police arrived there approximately ten minutes later. A crime scene technician collected his clothing and underwear, which had recently been purchased and never worn before that day. The technician recovered what was later determined to be a head hair from J.L.'s T-shirt and a pubic hair from his underwear.

At trial, both N.E. and J.L. described the events surrounding the crime and the assailant's appearance. N.E. testified that the assailant was a man of average weight, roughly five feet ten inches tall, with a couple of days' growth of beard. He said that the assailant was wearing a ball cap with black letters on the front, and a Jack Daniels T-shirt. J.L. testified that the assailant was five foot seven or eight inches tall, wearing dark clothing and a baseball hat. In a statement given to the police right after the incident, J.L. described him as a white male, 20 to 30 years old, five feet seven inches tall, weighing approximately 170 pounds. J.L. also described the man with a couple of days' growth of beard stubble on his face, and wearing a Jack Daniels T-shirt. Neither N.E. nor J.L. could identify the defendant as the individual who assaulted them. The defendant was five feet nine inches tall, and at the time of trial, weighed 185 to 190 pounds and was 32 years old. His age at the time of the assault would have been 29 years.

Ms. Darvine Duvenci, who was employed by the Regional Crime Lab in Kansas City, compared the hairs taken from J.L.'s underwear and T-shirt to the hairs taken from the defendant. Ms. Duvenci's qualifications, education, and experience were described for the jury. Ms. Duvenci had been a forensic chemist for 12 years, and estimated that she performed approximately 100 hair comparisons a year. She was certified as a criminalist by the American Board of Criminalistics. She had attended numerous well-recognized forensic science-teaching programs, including the one sponsored by the F.B.I. Her qualifications were admitted.

Ms. Duvenci mounted the hairs taken from the defendant and "unknown" hairs on slides and used a transmitted light microscope to compare the hairs side by side. The hairs were examined, under magnifications of 40 to 400, along the hair shafts, from the root to the tip. In making the comparisons, Ms. Duvenci examined a range of characteristics in the hairs. While Ms. Duvenci acknowledged that she could not state with certainty that there would not be another individual who might also have similar hair features, she testified that she was 100 percent positive that the defendant's hairs microscopically matched the ones recovered from the victim's underwear and T-shirt. Furthermore, based upon her judgment and experience, she stated that, within a reasonable certainty, and that it was a "very strong probability," the hairs found on J.L. origi-

---

1. The crimes occurred at 9:30 to 10:00 P.M. Sunset on August 31, 1993, was at 7:50 P.M.

nated from the defendant. There was no objection to her testimony.

A critical factor influencing Ms. Duvenci's opinion was a black spot seen on the medulla of the hair found on J.L.'s underwear. She considered it very unusual that the same identical black spot was found on the medulla of the defendant's pubic hairs. Ms. Duvenci said that she did not recall having ever seen a match with this characteristic before in the cases she had studied. She also testified that it was *"very rare to find not only two head hairs, unknown head hairs that happen to match somebody else, but also two hairs from totally different body regions that match the individual."* She observed that matching two hairs from two separate parts of the body was "like double significance of evidence."

The defendant denied that he committed the crimes and testified that he did not fit the description of the assailant. He gave an explanation as to how the two body hairs found on J.L. may have come from him. He testified that he was at the mobile home park's swimming pool on the afternoon of the day the assault occurred, and that a boy who looked like J.L. was swimming at the pool. He testified that the swimmers left their clothes and towels in a pile at the end of the pool. He remembered that he left his towel in the pile of clothes and towels. Both attorneys asked the defendant about his location and alibi at the time the crimes were committed. He answered that he presumed that he was home, alone.

### Standard of Review

When the sufficiency of the evidence is the issue, this court "does not act as a 'super juror' with veto powers," *State v. Grim,* 854 S.W.2d 403, 414 (Mo. banc 1993), but instead, gives *great* deference to the trier of fact. *State v. Chaney,* 967 S.W.2d 47, 52 (Mo. banc 1998) (emphasis added). An appellate court is compelled to view the sum of all of the evidence, and its

reasonable inferences, in the light favorable to the guilty verdicts. *Id.* Our review "is *limited* to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Id.* (quoting *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989)) (emphasis added). We are obligated to consider the favorable evidence and inferences therefrom in determining whether there was evidence of guilt beyond a reasonable doubt upon which the jury could base its verdict. *Id.*

Emphasizing the great deference to be given to the trier of fact, the United States Supreme Court stated that the appropriate inquiry "does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (quoted in *State v. Chaney,* 967 S.W.2d at 52). "Instead, the relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 318–19, 99 S.Ct. 2781 (emphasis added) (quoted in *State v. Chaney,* 967 S.W.2d at 52).

We first address the defendant's last point. It reads as follows: "The court erred in denying the defense motion for a judgement [sic] of acquittal on the grounds of insufficient evidence."[2] The thrust of his complaint is that Ms. Duvenci's testimony regarding the comparison of the defendant's hairs to those found on the victim's underwear and T-shirt was not sufficient to make a submissible case for the jury's consideration. This argument is premised on the notion that the only evidence of guilt was the hair evidence, which he describes as ambiguous. His argument ignores Duvenci's testimony that it was her opinion, within a reasonable certainty,

---

**2.** The point falls short of satisfying the requirements of Rule 30.06(d). However, we are able to discern from the point relied on

and the argument portion of the brief that his argument is directed solely to the submission of the case to the jury.

and a very strong probability that the hairs found on J.L.'s clothing came from the defendant.[3] He also neglects to mention the other evidence of guilt. Ms. Duvenci's qualifications are unchallenged and the "admissibility" of her testimony is accepted.

**Lack of an objection**

As noted, there was no objection to Ms. Duvenci's opinion that the hair comparisons were within a reasonable certainty. The Missouri Supreme Court has held that admissibility of an expert's opinion becomes an issue "only if there is a timely and specific objection." *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852, 860 (Mo. banc 1993)(citing *Missouri Evidence Restated*, § 103 (Mo. Bar 2d ed.1993)). The value of the expert's opinion is then for the jury to measure, considering its assessment of the opinion's reasonableness in light of all of the evidence and the qualifications of the witness.

The extent to which the scientific community accepts hair comparisons as proof of guilt is, in the first instance, a foundation question to be determined by the trial court. *State v. White*, 621 S.W.2d 287, 293 (Mo.1981). The requirement of a contemporaneous objection is not a mere technical rule of procedure. *State v. Lassen*, 679 S.W.2d 363, 368 (Mo.App.1984). An objection tests the expert's testimony as it relates to scientific principles and the grounds upon which the opinion is based. It permits the trial court to make a determination that those principles and tests have gained scientific acceptance in the scientific community and are, therefore, reliable. *State v. Erwin*, 848 S.W.2d 476, 479–80 (Mo. banc 1993). An "objection to a putative error affords the trial court an opportunity to invoke remedial measures rather than relegating appellate courts to the imprecise calculus of determining whether prejudice resulted." *State v. Barnett*, 980 S.W.2d 297, 304–05 (Mo. banc

1998)(quoting *State v. Borden*, 605 S.W.2d 88, 90 (Mo. banc 1980)).

A line of Missouri cases pointedly cautions against ignoring the requirement that the offending evidence be challenged in the trial court when the issue is the foundation for an expert's opinion. See *State v. Hudson*, 970 S.W.2d 855, 857 (Mo. App.1998); *State v. Blue*, 875 S.W.2d 632, 633 (Mo.App.1994); *State v. Jones*, 569 S.W.2d 15, 16 (Mo.App.1978). The importance of challenging a forensic scientist's hair comparison testimony at trial was most recently discussed in *State v. Hudson*. In *Hudson*, the defendant claimed that it was error to permit the expert, who was employed by the Southeast Missouri Regional Crime Laboratory, to give a statistical probability based on the similar qualities of the defendant's hair and the hair found in a stocking cap. 970 S.W.2d at 857. No objection was made to the foundation or to the scientific principles underlying the expert's opinion. *Id*. On appeal, Hudson claimed that the expert's testimony was inadmissible because the procedures used by the expert were not shown as having gained general acceptance in the particular field in which it belonged, as required by *Frye v. U.S.*, 293 F. 1013, 1014 (D.C.Cir.1923). *See also State v. Davis*, 814 S.W.2d 593, 600 (Mo. banc 1991), *cert. denied*, 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992). The court held that the issue was not preserved for appellate review. *State v. Hudson*, 970 S.W.2d at 860. Furthermore, the court held that plain error review would not be afforded to a party who did not object to the foundation for the opinion. *Id*.

When faced with the problem of a lack of an objection to expert testimony, the courts of Missouri have been clear in their holdings. In *State v. Blue*, the court reiterated the standard to be followed:

It is particularly important that where *an inadequate foundation* has been laid

---

**3.** The defendant does not argue that Ms. Duvenci's opinion failed the test set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

In fact, he does not mention the Frye case or argue its application to the submissibility issue.

for admission of evidence that the objection made be specific *as such foundation deficiencies can frequently be remedied.* We will not review the contention of inadequate foundation raised for the first time on appeal.

875 S.W.2d at 633(quoting *State v. Jones,* 569 S.W.2d at 16)(emphasis added).

Thus, in accordance with *Callahan, Hudson, Blue,* and *Jones,* Ms. Duvenci's opinion that, "within a reasonable certainty," the hairs found on J.L.'s underwear and T-shirt, came from the defendant, *"there is no issue of admissibility presented and none is preserved for appeal,"* *Callahan,* 863 S.W.2d at 860, and the evidence was properly before the jury. (Emphasis added). The opinion is to be weighed by the jury in determining guilt beyond a reasonable doubt. *State v. Brown,* 660 S.W.2d 694, 698 (Mo.1983). The jury, not an appellate court, is entitled to give whatever weight it deems appropriate. *State v. Guyton,* 635 S.W.2d 353, 360 (Mo.App. 1982); *State v. Lieberknecht,* 608 S.W.2d 93, 98 (Mo.App.1980).

**Sufficiency of the evidence**

The submissibility of the state's case does not rest solely on Ms. Duvenci's opinion linking the defendant to the crimes. The submissibility of the case is not dependent on one piece of evidence, or on the phrase that within a reasonable certainty the hairs originated from the defendant. Rather, it is the sum of all of the evidence linking the defendant to the crimes, including the reasonable inferences drawn from that evidence. We disagree with the defendant's argument that the only evidence of guilt was hair comparison evidence. Quite to the contrary, there is other evidence, in addition to Ms. Duvenci's testimony, bearing on the issue of the defendant's guilt, and thus, whether the case was properly submitted to the jury.

That the two boys were feloniously restrained, and that J.L. was sodomized are not at issue. The only issue for the jury was whether the defendant was the assailant. Accepting as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregarding all of the evidence and inferences to the contrary, as we must, we are obligated to conclude that the jurors had sufficient evidence to sustain their guilty verdict. *See State v. Chaney,* 967 S.W.2d at 52. The following is a summary of the evidence from which the jury could have properly found the defendant guilty.

A critical piece of the evidence linking the defendant to the crimes was that the individual who committed the crimes lived in the mobile home park, which narrows the field of suspects to a resident of the park. The principal reason permitting the jury to conclude that the perpetrator was a resident of the mobile home park was his statement to the boys that he had to go to his home to get the combination to the lock on the gate. Additionally, the perpetrator showed a surprising amount of knowledge and familiarity of the mobile home park and, specifically, of the boat storage area. This evidence permitted the jury to reasonably conclude that the perpetrator lived there.

The mobile home park had only two entrances, one for the residents and a smaller one for service vehicles. It was not designed for easy access by non-residents. The boat storage facility was further restricted to residents who stored their boats there. It was a wooded, secluded area, secured by a combination lock on the gate.

The facts that the jury heard were that, after dark, at approximately 9:30 to 10:00 P.M., the perpetrator, dressed in shorts and a dark T-shirt, was walking where the boys were located, near the boat storage area. After getting the boys' affirmative response for help, he told them that he had to go to his home to get the combination to the lock to the boat storage gate. He returned within 5 to 10 minutes and said that he could not find the combination to the lock, but knew a spot where they could climb over the fence. This spot, where the

fence was supposedly knocked down, was in a secluded part of the boat storage area. He then followed the boys to a secluded place where he sodomized J.L. The jury viewed aerial photographs of the mobile home park, which showed the number of homes in the park, the relationship of all of the homes to the scene of the crime and specifically, the defendant's home in relationship to the boat storage area. The defendant testified that he lived a little over one-half mile from the boat storage area. Other photographs confirmed both the secluded nature of the boat storage area and that a combination lock was used to secure the gate.

It was the defendant's testimony that only residents could store their boats in the boat storage area. As such, the perpetrator's statement that he had the combination to the lock on the gate was a statement from which the jury could conclude that he had access to the boats and therefore, was a resident. Second, the perpetrator displayed specific knowledge of the mobile home area when he stated that the gate was secured by a combination lock, and not a key lock. Finally, the time it took the perpetrator to go to his home and return was consistent with the distance that the defendant testified that he lived from the boat storage area.

The jury had before it evidence that the perpetrator was an individual who had access to private premises, late at night, with information about the area generally known only to the people who lived there, all of which was confirmed by other evidence. Even though the reviewing court may be convinced that, if it were sitting as the trier of fact, it would have weighed the evidence differently, the weight to be accorded particular evidence was a decision for the jury, and the reviewing court may not substitute its judgment for that of the jury. *State v. Clark,* 596 S.W.2d 747, 749 (Mo.App.1980). As our Supreme Court stated in *City of Kansas City v. Thorpe,* "[w]here different inferences are reasonably deducible [from the facts and circum-

stances of the case], it is for the triers of the facts to determine which inference shall be drawn and [the Supreme Court] may not cast aside their inferences for another of [its] own choice." 499 S.W.2d 454, 459 (Mo.1973) (quoting *State v. Selle,* 367 S.W.2d 522, 528 (Mo.1963)). The Court of Appeals does not determine credibility of witnesses, resolve conflicts in testimony, or weigh evidence, as these tasks are quite properly left to the jury. *State v. Idlebird,* 896 S.W.2d 656, 660–61 (Mo. App.1995).

Other evidence of the defendant's guilt was the boys' description of the perpetrator that he was a white male, in his late 20s or early 30s, average weight, and roughly five feet ten inches tall. The defendant is a white male, five feet nine inches tall and weighed 185 to 190 pounds at the time of trial. In August 1995, he was 29 years old. The similarity between the boys' description of the assailant and the defendant's height, weight, and age is probative and persuasive evidence pointing to the defendant. Any discrepancies between the boys' identification of him and the defendant's testimony were credibility calls for the jury. *State v. Neal,* 849 S.W.2d 250, 253 (Mo.App.1993)(citing *State v. Dulany,* 781 S.W.2d at 55). In *Neal,* this court pointedly stated, "[t]hese were factors for the jury to consider, not this court." *Id.* at 254. "An appellate court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *State v. Chaney,* 967 S.W.2d at 53–54 (quoting from *Jackson,* 443 U.S. at 326, 99 S.Ct. 2781).

But for the dissent's attempt to fashion some basis of appellate review under *Callahan,* there would be nothing further for our review, and the convictions would be affirmed.

Hair comparison evidence is accepted in this state as reliable for identifying indi-

viduals accused of crimes. *State v. White,* 621 S.W.2d 287, 293 (Mo.1981). In *White* the expert concluded, "that hair samples taken from the murder scene matched with those taken from the defendant." *Id.* at 292. The challenge in *White,* as in the case before this court, was that the expert's opinion lacked sufficient scientific acceptance and thus, was incompetent. *Id.* at 292. This issue was placed squarely before the Supreme Court in *White,* and unlike this case, was unencumbered by a lack of objection. After reviewing the forensic expert's education, training, experience, and techniques employed, the Supreme Court in *White,* held that the witness properly expressed an opinion that the unknown hairs found on the murder weapon matched the defendant's, *Id.* at 293, and that hair comparison evidence is competent for purposes of determining the sufficiency of the evidence. *Id.* at 292–93.

Accordingly, as in *White,* there was "a sufficiently high incidence of similarity between the hair comparisons to allow an expression of [the expert's] opinion as to their source." *Id.* at 292. As White instructs, the evidence is competent for the purpose of determining the sufficiency of the evidence. *Id.* at 292. See also *Calla-han,* 863 S.W.2d at 860; *State v. Kleypas,* 602 S.W.2d 863, 869 (Mo.App.1980); *State v. Marlow,* 888 S.W.2d 417, 421 (Mo.App. 1994).

Missouri, as well as most jurisdictions, have repeatedly held that hair comparison evidence has probative value to prove a defendant's guilt.[4] Hair comparison evidence that affirmatively establishes the defendant's participation in the crime has probative value. If the expert's opinion tends to link the defendant with the crime, it is neither inadmissible nor lacks credibility because the conclusion sought to be proven is not absolute. *State v. Maxie,* 513 S.W.2d 338, 344 (Mo.1974)(where expert expressed his opinion that "it was highly probable that the fibers came from that shirt"). The limitations of proof of hair evidence do not defeat its probative value nor prohibit it from being competent evidence of guilt. *State v. Jones,* 777 S.W.2d at 641; and *State v. Brown,* 660 S.W.2d at 698.

We agree with Ms. Duvenci's testimony that hair comparison evidence, standing alone, will not generally make a submissible case. She explained that the state of hair comparison evidence is such that one cannot quantify an exact percentage of the

---

4. The defendant, and the dissent, cite cases from other jurisdictions that limit the probative value of hair evidence. Contrary to those holdings are decisions from Illinois, Colorado, Pennsylvania, Wisconsin, and Rhode Island, where greater weight is given to hair comparison evidence, and in some of the cases, the courts have permitted the testimony to be expressed within a reasonable certainty. Although the disposition of this case is not dependent on an opinion expressed within a reasonable certainty, these cases are persuasive that hair evidence is positive evidence linking the defendant to the crime. In *People v. Buie,* 238 Ill.App.3d 260, 179 Ill.Dec. 447, 606 N.E.2d 279, 287 (1992), a hair expert testified, "within a reasonable degree of scientific certainty" that the hair originated from the defendant, although he could not exclude all other persons in the world as a possible source of the hair fragments. The court held that there was a sufficient basis for the expert's opinion that the unknown hair originated from the defendant. *Id.* at 287. In *Padilla v. People,* an F.B.I. hair and fabric expert testified that a strand of hair found in the defendant's vehicle "unequivocally" was from the victim. 156 Colo. 186, 397 P.2d 741, 743 (1964). The court noted that the weight to be given the evidence was for the jury. *Id.* In *State v. Hunt,* testimony that hairs found in the lining of the defendant's jacket belonged to the decedent was admitted even though the identification was not an absolute certainty. 53 Wis.2d 734, 193 N.W.2d 858, 867 (1972). In *State v. Earley,* a special agent's testimony that a microscopic comparison determined that "a reasonable probability" that the hair found on the ski mask worn and abandoned by the perpetrator belonged to the defendant, with the weight to be given by the jury. 118 R.I. 205, 373 A.2d 162, 165 (1977). The court in *Commonwealth v. McCauley,* after a thorough examination of the law, stated that "microscopic hair comparison evidence satisfies the *Frye* standard." 403 Pa.Super. 262, 588 A.2d 941, 947 (1991).

population as a contributor of a certain hair. Rather, her opinion was based on her experience and judgment considering the unique factors that were developed by her study of the case, not the least of which was the unique character and number and source of the hairs compared, resulting in the hair comparison evidence being statistically more compelling than the usual case.

Although Duvenci's opinion may not have been supported by statistical studies, such data is not an absolute necessity in order for an expert to render an opinion. *State v. Kleypas,* 602 S.W.2d at 869. *Kleypas* dealt with a human bite mark on the victim, which was matched to dental impressions of the defendant's teeth. *Id.* at 867–70. As in the case before this court, there was other evidence of Klepas' guilt, which put the defendant at the back door of the victim's house at or near the time of the crime. At issue was the source of the bite marks found on the victim's body. The expert for the state, a dentist, testified that the bite marks on the body "were *compatible* with the impression of the occlusion and the diagnostic cast and *could* have been made by these teeth" and that the bite marks were "consistent with marks made by the mouth of the defendant." *Id.* at 868. (Emphasis added). On cross-examination he stated his opinion "within a reasonable scientific certainty," which the trial and the appellate courts disregarded in arriving at their respective decisions. *Id.* at 869.

In analyzing the *Frye* rule, the court observed that statistical science, as applied to the points of similarity, might produce varying degrees of probability. *Id.* at 869.[5] Depending on the number of points of similarity, there are different degrees of certainty of identification. *Id.* "One point

of similarity may be so remarkable the result is certainty of identification. One point of dissimilarity may eliminate a connection of a mark or trace with a defendant." *Id.* The court held that in "*some circumstances the similarities may establish a high degree of probability in the absence of statistics.*"[6] *Id.* (emphasis added).

As a result, the court held that there was sufficient evidence of guilt even if the expert's testimony of *a reasonable medical certainty* was excluded because the testimony that the bite marks were *compatible* with or *could have* been made by the defendant's bite was "clearly sufficient to support the conviction." *Id.* at 870. Likewise, if we exclude Duvenci's opinion given "within a reasonable certainty," the remainder of her testimony identifying the body hairs found on J.L. as originating from the defendant, coupled with the other evidence, was clearly sufficient to support the convictions. *See also State v. Maxie,* 513 S.W.2d at 344–45. (Expert's opinion admitted concerning the source of cloth fibers without supporting statistical data).

A fair review of the *totality* of Ms. Duvenci's testimony compels the conclusion that it was probative evidence of the defendant's guilt, disregarding the part of her opinion, which stated that it was within a reasonable certainty. The basis for Ms. Duvenci's opinion that the hairs found on J.L.'s underwear and T-shirt originated from the defendant, was: (1) that the hairs displayed the numerous points of similarity between the defendant's head and pubic hairs and the ones found on the victim, with no points of dissimilarity, under magnifications of up to 400 times normal; (2) that the unique black spot on the medulla of the hair removed from the victim's un-

---

5. *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923).

6. Studies of the methodology and statistical reliability of hair comparison analysis can be found in the works of B.D. Gaudette. Published works include: Probabilities and Human Pubic Hair Comparisons, 21 J. Forensic Sci. 514 (1976); Some Further Thoughts on Probabilities and Human Hair Comparisons, 23 J. Forensic Sci. 758 (1978); A Supplementary Discussion of Probabilities and Human Hair Comparisons, 27 J. Forensic Sci. 279 (1982).

derwear was identical to the black spot found on medulla of the defendant's pubic hair; (3) that microscopically, she was 100 percent certain that the hairs found on the victim matched the defendant's, and (4) that she had two hairs, a head and pubic hair, both of which microscopically matched the defendant's pubic and head hairs.

Ms. Duvenci's qualifications were admitted. In the case before this court, Duvenci's qualifications are not challenged; in fact, they are admitted. Her examination was comprehensive. The techniques she employed were accepted and standard methods used in the scientific community to examine trace evidence. *See State v. White*, 621 S.W.2d at 293. Her testimony provided the jury with demonstrable evidence linking the defendant to the crime. *Commonwealth v. McCauley*, 588 A.2d at 947. All of these factors establish the weight and credibility of her testimony as discussed in *Callahan*.

### Additional Evidence of Guilt

If any doubt of the defendant's guilt remained, his guilt was firmly established by his own testimony. An accused, "by putting on evidence, takes the chance of aiding the state's case." *State v. Wells*, 729 S.W.2d 591, 593 (Mo.App.1987)(citing *State v. Johnson*, 447 S.W.2d 285, 287 (Mo. 1969)). The jury is entitled "to believe all, some, or none of the witnesses' testimony in arriving at its verdict." *State v. Brown*, 984 S.W.2d 535, 537 (Mo.App.1998).

By his testimony, the defendant not only placed himself in the mobile home park at the time the crime occurred, without an alibi, but also near the scene of the crime with one of the victims a few hours before. Moreover, his varying and improbable accounts, explaining how his body hairs were transferred to J.L.'s underwear and T-shirt showed an overall plan to lie to conceal his guilt.

The defendant never denied that the body hairs found on the victim were his. Instead, he chose to tell the jury an account designed to explain how his body hairs were transferred from his towel, and eventually came to rest in J.L.'s underwear and T-shirt. He gave the jury two versions as to how his body hairs may have ended up on J.L.'s underwear and T-shirt.

The defendant set up his account by giving a detailed recall of the events at the pool on the afternoon of August 31, 1993, although he did not become a suspect until over one and a half years later, in April of 1995, when the police collected hair and blood samples from him. In spite of the lengthy time interval between the crime and when the defendant acknowledged that he first became aware that he was a suspect, he testified in significant detail about the events that occurred at the swimming pool on August 31, 1993. He recalled that he got to the pool about 1:00 P.M. and left about 3:30 P.M. He remembered that his towel was blue. A critical part of the defendant's evidence was his testimony that he put his towel in a pile where all of the swimmers usually left their towels and clothes. A boy who looked like J.L. was at the pool. He told the jury that he was offering this evidence to explain how the pubic and head hairs found on J.L.'s underwear may have been his head and pubic hairs. That was his only explanation on direct examination as to how his body hairs may have been transferred to the victim's T-shirt and underwear. This was the first time he had related this version about leaving his towel in the pile at the end of the pool, except to his lawyer. He told the jury that he had previously testified that the hairs might have passed in the water.[7]

Cross-examination showed that in his first trial, the defendant testified that J.L. might have picked up his body hairs while in the swimming pool. He admitted that

---

7. The defendant's first trial ended in a mistrial. The second trial took place from July 22– 24, 1996.

he had originally testified that he was in the pool, roughhousing with several boys, one of whom looked like J.L., who received a cut to his head. He remembers that he somehow had contact with the person who looked like J.L. while he, the defendant, was in the pool. Also, he recalled a lady, who was sitting by the towels, who retrieved a towel and tended to the boy with the cut. The lady used the towel to wipe away the blood to determine how deep the cut was. He believed that it was possible that the towel the lady used to attend to the boy who looked like J.L., had his body hairs on it.

Ms. Duvenci testified between the defendant's first version given in his first trial and his second explanation, given in this case. The defendant repeatedly questioned her about the probability of hairs being transferred in water, whether there were any studies dealing with the likelihood of hairs transferring from one individual to another in water, and whether "hairs can float around in a swimming pool," or whether someone could pick them up in a swimming pool and transfer them to another party. When the obvious answer was in the negative, she went on to explain why it was highly unlikely that body hairs would be transferred in water. Following Ms. Duvenci's testimony, the defendant testified that his body hairs might have been transferred through the towels piled at the end of the pool, not in the pool as he had described in his first trial.

While the defendant was persistent in explaining that his body hairs were transferred innocently, his varying accounts as to the manner in which the hairs were transferred provided a legitimate basis for the jury to believe the defendant's explanation was evidence of his guilt. His "overall plan to lie to conceal his guilt" about how his body hairs may have gotten on J.L.'s underwear and T-shirt, allowed the jury to infer that he knew the hairs were his. State v. Chaney, 967 S.W.2d at 53.

The two versions are as inconsistent as they are illogical. The fact finder could rightly view the varying versions as an attempt to conceal his guilt. The defendant's deceptive testimony gives rise to an inference of guilty knowledge. See State v. Wells, 729 S.W.2d at 593. The logical inference from the defendant's two different explanations, improbable as they may have been, was that he knew that his body hairs were discovered on the victim. It is not for this court to cast an innocent slant on two contradictory theories if it is reasonably susceptible to an interpretation of an attempt to conceal guilt.

The changing accounts of how his body hairs may have found their way to the victim's underwear and T-shirt is heightened by the obvious disparity between the clarity of the defendant's recall of events on the afternoon of the crimes and his almost complete inability to remember his whereabouts later that night when the crimes occurred. When asked by his attorney where he was that night, he answered, "[p]robably at home." The prosecutor inquired if he was at home around ten o'clock that night. He answered, "I would assume so."

It is not unreasonable for the jury to conclude that the defendant's detailed recall of the events that occurred over one-and-a-half years earlier were triggered by an occurrence of some greater significance than witnessing some boys roughhousing in the pool. The defendant's vivid recall of trivial events permitted the jurors to infer that the defendant was involved in the crime. The jury could properly believe that the defendant's varying and implausible hypothesis of innocence, coupled with lack of an alibi, was an attempt to cover the truth that the body hairs found on J.L. were his. State v. Chaney, 967 S.W.2d at 53.

Finally, some comment is necessary in light of the dissent's use of Callahan to support appellate review of an expert's opinion to which there has been no objection. The dissent, not the defendant, fash-

ions a basis for appellate review under *Callahan.*

*Callahan* is a civil case which addressed a "but for" causation submission of negligence to the jury. Two medical experts' opinions were received without objection. Their opinions were not based on any scientific studies as required by *Frye.* Thus, if this civil case, concerned with "but for" casual connection of negligence, is authority for appellate review of the submissibility of a criminal case, then our review is obligated to follow the other instructions of *Callahan.* Assuming, without agreeing, that *Callahan* provides a basis for review, then we are instructed by *Callahan,* that the defendant is "reduced to arguing that the expert's testimony was so deficient in weight and credibility that it has little or no value on the issue of causation." *Id.* Furthermore, if *Callahan* constitutes authority for appellate review of the weight and credibility of an expert's opinion in this case, then our review must also accept the twice repeated principle in *Callahan* that "we will review the testimony of the [expert] in the light most favorable to the [verdict]", *Id.* at 863, a standard which the dissent does not accord Duvenci's testimony.[8]

In *Callahan,* two doctors testified within a reasonable medical certainty that there was causal connection between the negligent act and the injury. There were no statistical studies supporting their opinions. *Id.* at 864.

Briefly, the facts in *Callahan* were that the child's immune system was suppressed and susceptible to a routine polio vaccine he had received a number of weeks earlier. *Id.* at 857. The doctors' theory was that the polio virus replicated rapidly overcoming the suppressed immune system, resulting in poliomyelitis. *Id.* at 857–58. There were numerous differing medical opinions concerning the causal connection between the failure to properly treat an abscess and the resulting contraction of polio. *Id.* at 858. The issue on appeal in *Callahan,* as it relates to the point here under consideration, challenges the adequacy of the foundation of the expert's opinion, charging that it failed the *Frye* test.[9] *Id.* at 860.

The Supreme Court, after clarifying the relationship of the *Frye* rule concerning the question of submissibility and admissibility, noted that an expert's opinion "must be based on scientific principles that are generally accepted in the relevant scientific community." *Id.* at 860 (citing *Frye,* 293 F. at 1014). The doctors did not base their testimony on epidemiological studies showing that the polio vaccine will develop into polio virus if a child's immune system becomes suppressed, *Id.* at 863–64, because during the 40-year history of use of polio vaccine, there had rarely been occurrences of vaccine-induced poliomyelitis. *Id.* at 864.

*Callahan* teaches several principles applicable here. First, Duvenci's opinion,

8. It is stated that there is a distinction between objections to foundation and objections which go to the reliability of the opinion, suggesting in the latter situation that an objection at the trial would be of no value. Of course, there is no such distinction, and *Callahan* does not stand for such a proposition. The purpose of the *Frye* test is to establish reliability by requiring accepted studies in the particular field under consideration. Reliability is established if the expert's opinion is based on scientific principles that are generally accepted in the relevant scientific community. *State v. Taylor,* 663 S.W.2d 235, 239 (Mo. banc 1984); *State v. Erwin,* 848 S.W.2d 476, 480 (Mo. banc 1993). The reliability of the expert's opinion is dependent on the foundation established. Thus, an objection to the

foundation, or the lack of a foundation, challenges the reliability of the proffered opinion. See *State v. White,* 621 S.W.2d at 292 (where the Supreme Court stated that the "admission of hair sample comparisons will depend on scientific support for their reliability.") The *Frye* test requiring "general acceptance in the field in which it belongs," *Id.* at 1014, attains reliability. *State v. Davis,* 814 S.W.2d 593, 600 (Mo. banc 1991).

9. There was no objection to the foundational requirement for the doctor's opinions in the trial court but, unlike the case before this court, the defendants in *Callahan* raised the *Frye* rule.

not having been objected to, was properly admitted and is "properly considered in determining the sufficiency of the evidence." *Id.* at 863 (citing *Appelhans v. Goldman,* 349 S.W.2d 204, 207 (Mo.1961)). Second, after holding that the expert's opinion was properly received and considered in determining the sufficiency of the evidence, the Court observed that the defendant "was *reduced* to arguing weight and credibility of the expert's testimony," *Id.* at 863, and to evaluate that argument, the weight and credibility of the expert's testimony must be considered "in the light most favorable to the plaintiff." *Id.* at 863 and 864 (emphasis added).

Ms. Duvenci's opinion was obviously influenced by the black spot in the medulla of the defendant's pubic hairs and the two hairs from separate parts of the body, which were microscopically identical to the defendant's head and pubic hairs. These are relevant factors which must be considered in determining the weight and credibility of the opinion. Ms. Duvenci's observation concerning the medulla was the subject matter of *State v. Jones,* 777 S.W.2d 639, 641 (Mo.App.1989). *In Jones,* the hair examiner from the Regional Crime Laboratory testified that he found a black spot on the cortex of the "unknown" hair and the defendant's hairs. The examiner testified that he had seen this condition in only one to two percent of the hairs he had examined. This court held that it was proper to allow the expert to testify to his observations. *Id.* As such, in evaluating the weight and credibility of Duvenci's testimony, this court must consider her observation, along with all of the rest of her testimony, that the matching black spots on the medulla of defendant's hair had never been seen in her examination of over 1200 cases in her 12 years of study and work.

The Supreme Court in *Callahan* continued by considering the doctors' education, experience, and training. *Callahan* at 864. We need not repeat Ms. Duvenci's experience, training and qualifications. As not-

ed, they have been admitted. To exclude the testimony because there are no studies which serve as a foundation to permit the positive identification of a certain individual, ignores the unique characteristics of the defendant's pubic hair and Duvenci's common sense observation of the significance of two hairs from separate parts of his body; a remark not dependent on any scientific studies for support.

Furthermore, to the extent that the dissent orchestrates contradictory testimony from Duvenci, we repeat that it was for the jury, *who heard all of the testimony recited by the dissent,* to weigh and credit the expert's testimony in any respect which may have been contradictory. *State v. Parker,* 535 S.W.2d 126, 128 (Mo.App. 1976)(where the defendant claimed the fingerprint technician's testimony was contradictory).

Like the doctors in *Callahan,* Ms. Duvenci testified that she relied on her personal experience and training in arriving at her opinion. *Id.* at 864. Moreover, Ms. Duvenci testified to the limitations of hair comparison evidence, as the dissent has pointed out. It was then the jury's function to evaluate the weight and credibility of Duvenci's testimony. Each step leading to Ms. Duvenci's opinion is based on logic and reason, and the techniques employed were accepted and standard in the scientific community.

## Testimony of Uncharged Misconduct

The defendant's first point on appeal is directed at the police officer's testimony of uncharged misconduct. The officer, who testified for the state, was asked at what point the defendant first became a suspect in the case. He answered, "Back when he was identified in a separate investigation." Defense counsel objected. The court overruled the defendant's request for a mistrial, but instead instructed the jury to disregard the statement.

A defendant in a criminal trial has "a right to be tried only for the offense for which [he is] charged." *State v. Horn-*

*buckle,* 769 S.W.2d 89, 96 (Mo. banc 1989). The admission of evidence violates the rule "if it shows that the defendant has committed, been accused of, been convicted of or definitely associated with another crime or crimes." *Id.* "Vague references" are not clear evidence associating a defendant with other crimes. *Id.; State v. Hoff,* 904 S.W.2d 56, 60 (Mo.App.1995).

The police officer's testimony did not indicate a similar or any particular prior crime or sexual offense. Defense counsel objected, and after a brief bench conference out of range of hearing by the jury, the jury was immediately instructed to disregard the matter. Declaring a mistrial is a drastic remedy and is to be exercised only in extraordinary circumstances. *State v. Young,* 701 S.W.2d 429, 434 (Mo. banc 1985). The trial court, having observed the incident, is in a better position than an appellate court to evaluate prejudice. *Id.* Our review extends only to determining if there was an abuse of discretion, *id.,* and we discern none.

### Armed Criminal Action

The defendant next argues that the weapon described looked more like a B.B. gun. This point is without merit. Both boys thought the weapon was a real gun. J.L. specifically described it as black, like a .45, squared off at the end. He said, "it looked real enough to me." *See State v. Hillis,* 748 S.W.2d 694, 696 (Mo.App.1988). As such, the testimony of the victims that the assailant brandished a gun was sufficient evidence to submit this charge. *State v. McCoy,* 748 S.W.2d 809, 811 (Mo. App.1988).

### Conclusion

The evidence substantially narrowed the pool of suspects to a white male, in his late 20s, living in the mobile home park where the crimes were committed, and where the boys and the defendant lived. The pool of suspects was further reduced to an individual of average weight, about 5'10" tall in his late 20's. It is from this limited pool of suspects that Duvenci's testimony must be considered. She testified that the defen-

dant's pubic hair had such a remarkably rare identifying characteristic as not seen before by an experienced forensic examiner in her twelve years of studying hair evidence. She also explained that the pubic and head hairs found on J.L.'s underwear and T-shirt were microscopically indistinguishable from the defendant's head and pubic hairs and very probably came from the defendant. Furthermore, she described the two matching pieces of evidence, from two separate parts of the defendant's body as double significance. J.L.'s new underwear and T-shirt, ruled out any other unusual occurrence that may have caused the unknown hairs to get on his clothes.

The evidence pointed directly to the defendant as he knew the victim, had been with him the afternoon of the crime, lived at the same mobile home park where the crimes occurred, and where both victims lived, where the victims were first contacted, and who, by his own admission, was within a short distance of the crime scene without an alibi when the crimes were committed. In explaining how his hairs were transferred to the victim, the defendant gave implausible and varying versions of his innocence, permitting the jury to infer a consciousness of guilt from his untruths. These facts, and the inferences drawn from them, are more than coincidences or speculation of guilt. Once these facts were before the jury, it was for the jury, not this court, to determine whether they constituted evidence of the defendant's guilt beyond a reasonable doubt. *State v. Cunningham,* 763 S.W.2d 186, 188–89 (Mo.App.1988). These facts represent sufficient evidence upon which the jury rightly relied on in determining the defendant's guilt.

This holding does not disturb or expand the limitations of hair comparison evidence as presently recorded by the scientific community. It stands for the often-repeated rule in this state that an expert's opinion received in evidence without objec-

tion was properly considered by the trial court in ruling on the sufficiency of the evidence as well as by the jury in reaching its verdict. However, rejecting the expert's opinion stated within a reasonable certainty, which is the only legitimate challenge to her testimony, we specifically hold that the rest of the expert's testimony linking the defendant to the crimes was clearly sufficient to make a submissible case.

The judgment should be affirmed.

PAUL M. SPINDEN, Judge, concurring.

I concur with the opinion of Judge Harold L. Lowenstein. Because Butler did not object to Darvine Duvenci's opinion that "within a reasonable degree of certainty" the hairs on the victim's clothing came from Butler and that the matching of two hairs from two different parts of the body is like "double the significance of evidence," the circuit court properly admitted the testimony for the jury's determination. *Washington by Washington* v. *Barnes Hospital*, 897 S.W.2d 611 (Mo. banc 1995); *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852 (Mo. banc 1993). Because of the lack of objection, we need not concern ourselves with whether the content of Duvenci's testimony was proper in the absence of plain error. The circuit court did not err in admitting evidence offered without objection. Without error, we have no basis for *plain* error review.

PATRICIA BRECKENRIDGE, Chief Judge, concurring.

I concur with Judge Lowenstein's analysis that the State presented sufficient evidence from which a reasonable juror could find Mr. Butler guilty beyond a reasonable doubt. I write separately to note that I agree with Judge Stith's dissent that Ms. Duvenci's testimony that, to a reasonable degree of certainty, the hairs found on J.L.'s clothing were from Mr. Butler and that a match of hair from two body parts was "like double significance of evidence"

was inadmissible because it was not based upon scientific principles that are generally accepted in the relevant scientific community. Unlike Judge Stith's dissent, however, I believe this deficiency is an issue of lack of scientific foundation and that this court is precluded from considering any lack of scientific foundation for Ms. Duvenci's improper testimony when ruling on the issue of submissibility, as Mr. Butler failed to preserve the issue of its admissibility by not objecting to it at trial. Moreover, because Mr. Butler's reason for not objecting to the incompetent evidence was a matter of his counsel's trial strategy, this court is precluded from conducting plain error review of its admissibility. As a result, Ms. Duvenci's positive identification and quantification testimony must be considered in determining the submissibility of the State's case. When the entirety of Ms. Duvenci's testimony is considered with the other evidence in this case, I agree with Judge Lowenstein that it is sufficient to provide a reasonable juror with proof of Mr. Butler's guilt beyond a reasonable doubt.

At trial, Ms. Duvenci presented testimony as to her qualifications and a detailed description of the methods she used for her examination and comparison. After demonstrating for the jury her comparison of the unknown hairs found on the victim's clothing with the hair samples from Mr. Butler, Ms. Duvenci testified that the conclusion she reached from the comparison was that there were no major significant differences between the head and pubic hairs found on the victim's clothing and the samples of Mr. Butler's head and pubic hairs. She testified that "from her experience it's very rare to find not only two head hairs, unknown head hairs that happen to match somebody else, but also two hairs from totally different body regions that match the individual" and that the spot in the medulla of the pubic hair from the victim's clothing and from Mr. Butler struck her as "very unusual," as she had not observed it before in the 1200 cases

she has examined. She expressed her opinion that she was "one hundred percent certain" that the hairs "matched."

Ms. Duvenci further testified that it was her opinion, within a reasonable degree of certainty, that the hairs found on the victim's clothing came from Mr. Butler and her opinion that matching two hairs from two separate parts of the body was "like double significance of evidence." Judge Lowenstein finds that Ms. Duvenci's positive identification of a certain individual and her opinion of the significance of matching hairs from two body parts were based on logic and reason because Ms. Duvenci based her opinions upon her personal experience, in that she had not seen matching black spots on the medulla of pubic hairs or matching hairs from two different parts of the body in her examination of over 1200 cases in her 12 years of study and comparing hairs. Judge Lowenstein then cites Missouri law and cases from other jurisdictions to justify the admission of this evidence as probative of Mr. Butler's guilt. Judge Lowenstein's opinion obscures the lack of merit in his position by failing to identify, in his discussion of applicable law, the nature of Ms. Duvenci's testimony which is challenged— her testimony that the hairs on the victim's clothing came from Mr. Butler and that matching hairs from two body parts was "like double significance of evidence." Instead, Judge Lowenstein often refers to Ms. Duvenci's testimony simply as "Ms. Duvenci's opinion" or her testimony "within a reasonable certainty." While this discussion by Judge Lowenstein is dictum included to counter the arguments raised by Judge Stith's dissent, Judge Lowenstein is sanctioning the admission of positive identification and quantification testimony by a hair comparison expert. This would be the first time a Missouri court has approved the admission of this type of hair comparison testimony and such a holding is contrary to existing law requiring that an expert opinion be based on scientific principles and reasoning which are accepted by the relevant scientific community.

Unlike her positive identification and quantification testimony, Ms. Duvenci's testimony that the hairs found on the victim's clothing "matched" sample hairs from Mr. Butler was admissible. In *State v. White*, 621 S.W.2d 287, 292 (Mo.1981), the Supreme Court considered whether microscopic hair comparison expert testimony has sufficient scientific acceptance to be admissible. The Court found that "a sufficient basis exists to support a finding of scientific reliability of [microscopic] hair comparisons." *Id.* at 293. The Court stated that "[u]nder the circumstances of this case the state's expert was properly qualified to express his opinion as to hair comparisons" and it upheld the admission in evidence of the expert's testimony "that hair samples taken from the murder scene *matched* those taken from the defendant." *Id.* at 292–93 (emphasis added).

It is agreed by the relevant scientific community that when two hairs "share common attributes," they "match." P.D. Barnett & R.R. Ogle, *Probabilities and Human Hair Comparison*, 27 J. Forensic Sci. 272, 272–73 (1982). When conducting a hair comparison, a forensic scientist views the hairs microscopically to determine if there are any significant differences in the characteristics of the hairs being compared. As Ms. Duvenci testified, forensic scientists agree that there are only three possible conclusions a hair comparison expert can draw from this examination: (1) the hairs are not similar; (2) no conclusion can be reached; or (3) the hairs match based on microscopic characteristics and the hairs originated from the same person or another person whose hairs exhibit the same microscopic characteristics. Ms. Duvenci's conclusion that the microscopic characteristics of the hairs found on the victim's clothing "matched" the microscopic characteristics of Mr. Butler's hair samples is consistent with conclusion (3), so it is a conclusion accepted by

the scientific community and, therefore, proper expert opinion testimony.

The next portion of Ms. Duvenci testimony of significance is her testimony that "from [her] experience it's very rare to find not only two head hairs, unknown head hairs that happen to match somebody else, but also two hairs from totally different body regions that match the individual" and that the spot in the medulla of the *pubic* hair from the victim's clothing and from Mr. Butler struck her as "very unusual," as she had not observed it before in the 1200 cases she has examined. This testimony is similar to evidence found admissible in *State v. Jones,* 777 S.W.2d 639, 641 (Mo.App.1989). In that case, an expert testified that he observed uncommon big black spots in the cortex of the unknown hair and the hair of the defendant and that, in his experience, he had seen this characteristic in only one or two percent of the hairs he examined. *Id.* Following the rule of *Jones,* it is permissible for a hair comparison expert, like Ms. Duvenci, to present factual testimony about characteristics the expert observes and the expert's experience in observing such characteristics.

While these portions of Ms. Duvenci's testimony are admissible, she offers additional expert opinions for which there is no scientific foundation. The opinions expressed by Ms. Duvenci which are not accepted by the scientific community are her positive identification testimony that, to within a reasonable degree of certainty, the hairs found on the victim's clothing came from the defendant, and her quantification testimony that the matching of hairs from two different body parts has "double the significance."

Specifically, Ms. Duvenci testified that the hairs found on the victim's clothing were from Mr. Butler, as follows:

Q. And as I understand you can't tell me with a hundred percent certainty, but the question is within a reasonable degree of certainty in the field of forensic serology or trace evidence, do you have an opinion as to whether or not the unknown hair samples collected from the victim match the Defendant's?

A. I feel there is a very strong probability that those two hairs came from the Defendant.

Q. So within a reasonable degree of certainty you believe that the unknown hairs are in fact from the Defendant?

A. Yes.

\* \* \*

Q. But within a reasonable degree of certainty it's your opinion that the foreign hairs were from the Defendant?

A. Yes.

As Ms. Duvenci acknowledged in her testimony, and as the authoritative articles confirm, there is no scientific basis for testifying that a hair comes from a particular individual. Ms. Duvenci testified that the characteristics of hairs are not unique like the ridges of fingerprints, and there are not enough individual features in hair in the human population in comparison to the number of people in the world, in contrast to the genetic trace of DNA comparisons. While a DNA comparison of hairs can identify the source of the hair, the science of microscopic hair comparison is much less precise.[1] Hairs from more than one individual can have matching characteris-

1. Ms. Duvenci testified that it was possible to perform a mio-chondral DNA comparison on the hairs found on the victim's clothing and the hairs from Mr. Butler, but such a test was not performed because it was "not being done locally." If Mr. Butler had been identified as the source of the hairs on the victim's cloth-

ing through DNA analysis, I would not question the admissibility of the positive identification testimony because the state of the science of DNA comparison permits identification of a particular individual as the source of the hair.

tics, and there is no scientific agreement as to how often that occurs. *See* Clive A. Stafford Smith & Patrick D. Goodman, *Forensic Hair Comparison Analysis: Nineteenth Century Science or Twentieth Century Snake Oil?*, 27 COLUM. HUM. RTS. L.REV. 227 (1996); Barnett & Ogle, *supra*, at 278. Therefore, the state of the science is such that an expert can determine only if an individual is a possible source of a hair, not that the hair came from any particular individual. *See id.* In *White,* the Supreme Court approved the admission of scientifically accepted hair comparison evidence. 621 S.W.2d at 292–93. Hair comparison testimony which purports to identify a specific individual as the source of the hair is contrary to accepted scientific principles and would not be authorized by *White.*

In addition to Ms. Duvenci's positive identification of Mr. Butler based upon the hair comparison, the other opinion of Ms. Duvenci which is without scientific foundation is her testimony that the matching of two hairs from two different body parts is like "double the significance of evidence." Once again, no scientific authority supports this quantification of the significance of a "match" in hair comparison. In *Jones,* where the court affirmed the admission into evidence of the expert's testimony that he had only seen big black spots in

the cortex of hairs in one or two percent of the hairs he examined, the court found that the expert "did not testify to any probability, or percentage of probability" that the hair came from the defendant. *Jones,* 777 S.W.2d at 641. The expert in *Jones* did not attempt to attach a quantified significance to the observation of a rare characteristic. That is what was improper about Ms. Duvenci's opinion testimony. The scientific community does not accept a hair comparison expert utilizing personal experience to estimate probabilities since it is generally accepted that even controlled scientific studies cannot sufficiently determine reliable probabilities.

Nevertheless, Judge Lowenstein, purporting to rely upon *State v. Kleypas,* 602 S.W.2d 863, 869 (Mo.App.1980), states that "[a]lthough Duvenci's opinion may not be supported by statistical studies, such data is not an absolute necessity in order for an expert to render an opinion within a reasonable certainty." Judge Lowenstein's discussion of the facts and holdings of *Kleypas* is misleading, however.[2] In *Kleypas,* the expert witness testified, after describing his qualifications and the methods he used for his examination and comparison, that "the bite marks were 'consistent with marks made by the mouth of the defendant.'" During cross-examination,

---

2. Judge Lowenstein's opinion states that, "As in the case before this court, there was evidence of Kleypas' guilt, which put the defendant at the back door of the victim's house at or near the time of the crime." There is no comparison between the evidence establishing guilt in *Kleypas* and this case. In *Kleypas,* there was no challenge to the sufficiency of the evidence, and the court recited only a brief summary of the facts as "required to cast the background of the two points of error asserted by the defendant." *Kleypas,* 602 S.W.2d at 865. The facts were that the victim was a 78–year–old woman who lived alone. She was known to be alive on the evening of January 23, 1977. Her body was discovered the next morning at 8:00 a.m. There was fresh snow on the ground and only one set of footprints leading to and going away from the back door of the victim's home. The footprints were made by boots that left a distinctive track in the snow. The sheriff followed

the footprints to the back door of the house where defendant lived with his parents. Along the route, the sheriff found a vodka bottle, which the defendant admitted was his. The sheriff also found that defendant's boots were damp and the soles of his boots were compatible with the footprints in the snow. *Id.* There was additional evidence that the defendant was drinking orange juice and vodka the night before when his parents went to bed. *Id.* The defendant testified at trial that "although he awoke in the morning in his bed, he did not recall going to bed that night." *Id.* The defendant's hair samples were shown to match hairs taken from the victim's body. *Id.* In my opinion, this is overwhelming evidence of the defendant's guilt, without any reliance on the bite mark comparison testimony. This is different from our case, where the hair comparison evidence is necessary to make a submissible case.

however, the expert went beyond saying that the bite marks were consistent, stating that, " 'It's my opinion that within a reasonable scientific certainty the bite marks were made by the defendant.' " When questioned further, the expert admitted "that statistics relative to the number of people with very similar bite marks had not been accepted by the forensic dental field;" but the expert stated his own opinion that "the number would be very, very low." The defendant then moved to strike the entire testimony of the expert because it had not been shown that there was a recognized science of bite comparison. The court overruled the objection and, on appeal, the defendant challenged the admission in evidence of the expert witness's opinion that the bite marks on the victim's body were made by the defendant.

In determining the admissibility of the expert's bite comparison testimony, the court in *Kleypas* first noted that the rule concerning the acceptance of scientific tests as set forth in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), governed. The court in *Frye* stated:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Frye*, 293 F. at 1014. Thus, pursuant to *Frye*, expert testimony must be based upon principles which are generally accepted within the particular field of science. The court in *Kleypas* then discussed the *Frye* rule in the context of expert comparison testimony, stating the following:

[One] aspect of identification by comparison in which a scientific principle may be involved is a determination of whether or not the established points of similarity (used in the sense of being the same) are so unique that it may be said, within a required degree of certainty, the mark or trace was made by a specific person or by a specific object. This in turn may depend upon the state of the science of statistics in the field in question. The statistical science as applied to the points of similarity may produce varying degrees of probability. A varying number of points of similarity may lead to different degrees of certainty of identification. One point of dissimilarity may eliminate a connection of a mark or trace with the defendant. In some circumstances the similarities may establish a high degree of probability in the absence of statistics.

*Kleypas*, 602 S.W.2d at 869.

Judge Lowenstein relies upon the language that, under certain circumstances, the similarities found in a comparison may establish a high degree of probability in the absence of statistics, to support his holding that Ms. Duvenci could testify that the hairs came from Mr. Butler, in the absence of statistics permitting such an opinion. Using this language, Judge Lowenstein concludes that *Kleypas* allowed Ms. Duvenci to give positive identification and quantification testimony because Ms. Duvenci based her opinion upon her observance of unusual similarities which she believed created a high degree of probability that the hairs came from Mr. Butler. In drawing such a conclusion, however, Judge Lowenstein takes the language of *Kleypas* out of context and ignores the *Kleypas* court's application of the language to the expert's testimony. Judge Lowenstein's discussion also fails to even mention that the expert's opinion being challenged in *Kleypas* was that the bite marks were made by the defendant, and refers to the challenged opinion as testimony of "the source of the bite marks on the body" and

the fact that the expert stated his opinion "within a reasonable medical certainty." The fact that the challenge was to positive identification testimony was the crux of the *Kleypas* case.

The court in *Kleypas*, after stating that, under certain circumstances the similarities found in a comparison may establish a high degree of probability in the absence of statistics, went on to state that questions regarding the acceptable range of probabilities a witness may express, "and the extent to which an expression of a degree of probability must be supported by statistics[,]" are crucial "when, over objection, a witness is permitted to express a degree of probability, or when the sufficiency of the evidence to support a conviction is dependent upon the degree of certainty established." *Id.* at 869. For purposes of admissibility, however, the statistical basis for a comparison expert's testimony that a mark or trace *could have come from the defendant* is not as critical, so long as the points of similarity are not so common as to lack relevance. *Id.* Such evidence constitutes circumstantial evidence of guilt, and thus is admissible. *Id.* The court in *Kleypas* noted as an example of such admissible expert testimony "evidence that a microscopic examination revealed that hair could have come from the head of the defendant." *Id.* Applying this principle to the bite comparison expert's testimony, the court in *Kleypas* concluded that the expert's testimony "that the bite marks *were compatible with or could have been made by the defendant's bite* was relevant and was admissible." *Id.* at 870 (emphasis added).

The court in *Kleypas* then distinguished the expert's testimony that the bite marks *could have been made by the defendant* from the expert's cross-examination testimony that the bite marks actually *had been made by the defendant.* *Id.* The court stated that when the expert "stated with reasonable medical certainty the bite marks in question had been made by the defendant ... the statistical aspect of the

state of the science of forensic odontology [became] critical." *Id.* Because the defendant in *Kleypas* objected to the admission of *all* of the bite mark comparison expert's testimony, however, and not simply that part in which the expert expressed his opinion that, to a reasonable degree of medical certainty, the bite marks were made by the defendant, the court in *Kleypas* ruled that the trial court was correct in overruling the defendant's motion to strike. *Id.* Furthermore, the court found that the defendant suffered no prejudice by the admission of the positive identification testimony because the trial court, in finding the defendant guilty, "clearly indicated that it considered only the testimony that the bite marks were consistent and compatible with the defendant's teeth." *Id.* Contrary to the impression created by Judge Lowenstein's opinion, *Kleypas*, if read in its entirety, does not support the admission of Ms. Duvenci's testimony that, within a reasonable certainty, the hairs found on the victim's clothing came from Mr. Butler or her testimony that matching hairs from two parts of the body was "like double significance of evidence" without a statistical basis upon which to quantify those probabilities. The current state of the science is that there is no statistical basis for the quantification of such probabilities which is accepted by experts in the field of hair comparison.

Judge Lowenstein also cites *State v. Maxie*, 513 S.W.2d 338, 344–45, (Mo.1974), a fiber comparison case, to support the admission of Ms. Duvenci's testimony. In *Maxie*, the trial court found that the opinion of the expert was sufficiently supported by a factual basis. *Id.* There is no indication in the case that the expert opinion that a fiber came from the victim's shirt was contrary to the state of the science of fiber comparison, so I do not think it supports the admission of Ms. Duvenci's opinions which are contrary to the state of the science of hair comparison. I am also concerned with Judge Lowenstein's citing of four cases from other jurisdictions in

footnote 4, which he characterizes as "persuasive that hair evidence is positive evidence linking the defendant to the crime." In truth, these cases affirm a trial court's admission into evidence of expert testimony that unknown hair came from a particular individual. Despite the fact that the defendants' claims of improper admission of the evidence appear to be properly preserved, in three of the cases, the courts do not address the lack of scientific foundation for the expert opinions. *See Padilla v. People,* 156 Colo. 186, 397 P.2d 741, 743 (1964); *People v. Buie,* 238 Ill.App.3d 260, 179 Ill.Dec. 447, 606 N.E.2d 279, 287 (1992); *State v. Earley,* 118 R.I. 205, 373 A.2d 162, 165 (1977). Because the expert opinions permitted in those cases are contrary to the state of the science of microscopic hair comparison and not generally accepted by the scientific community, this court should not approve them. In the fourth case, *State v. Hunt,* 53 Wis.2d 734, 193 N.W.2d 858, 868 (1972), the court found that it was sufficient that the defendant could cross-examine the expert on the lack of scientific foundation for his opinion that the hair came from a particular individual. This is contrary to Missouri law. *See Washington by Washington v. Barnes Hosp.,* 897 S.W.2d 611, 616 (Mo. banc 1995) (finding that the question of sufficiency of the scientific foundation supporting an expert's opinion is one of admissibility determined by the trial court). Thus, *Hunt* should also not be cited with approval by this court.

Ms. Duvenci's testimony that, within a reasonable degree of certainty, the hairs found on the victim came from Mr. Butler, and her opinion that matching two hairs from two separate parts of the body was "like double significance of evidence," are statements for which there is no scientific basis and that such evidence should have been excluded if a proper objection had been lodged, and that without said evidence there would not have been sufficient evidence to make a submissible case. Proof from which a reasonable juror could find guilt beyond a reasonable doubt is not

established by the evidence that Mr. Butler was a resident of the trailer park who fit the general description of the assailant; that the hairs found on the victim's clothing matched Mr. Butler's head hair and unusual pubic hair, and the hairs could have come from Mr. Butler or another individual whose hairs exhibited the same microscopic characteristics; that Mr. Butler lacked an alibi; and that his defense theory of transference of hair to the victim's clothing was questionable. This evidence raises only a suspicion or conjecture that Mr. Butler was the perpetrator of the crimes and does not prove such beyond a reasonable doubt. *See State v. Scott,* 177 Mo. 665, 76 S.W. 950, 952 (1903). *See also State v. Stallings,* 77 N.C.App. 189, 334 S.E.2d 485, 486–87 (1985). Nevertheless, defense counsel did not object to the admissibility of Ms. Duvenci's positive identification and quantification testimony, so that evidence is properly considered in determining whether a submissible case was made. When considering all the evidence that was before the jury without objection, I believe there was sufficient evidence of Mr. Butler's guilt beyond a reasonable doubt.

Judge Stith's dissent disagrees with my conclusion that there is a submissible case if Ms. Duvenci's improper testimony is considered. She relies on the Supreme Court's opinion in *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852 (Mo. banc 1993), as authority for its assertion that Ms. Duvenci's testimony was so lacking in weight and probative value that no reasonable juror could find that it meets the reasonable doubt standard, so a submissible case was not made. In *Callahan,* the defendant challenged the sufficiency of the evidence to support the judgment because there was no evidence that the plaintiff's expert witnesses' testimony was based on scientific principles that are generally accepted in the relevant scientific community as required by *Frye,* 293 F. 1013. *Callahan,* 863 S.W.2d at 860. The Supreme Court noted that the issue raised was one

concerning admissibility rather than submissibility, and since there was no objection to the testimony of the plaintiff's experts, there was no issue of admissibility presented or preserved for appeal. *Id.* The Supreme Court stated that it had found no case "that permits a party to blissfully ignore the requirement to object to evidence based on the *Frye* doctrine and then 'back-door' the *Frye* issues into the lawsuit under the guise of a sufficiency of the evidence argument." *Id.*

When the Supreme Court proceeded to address whether there was sufficient evidence on the element of causation, the Court stated that "[i]nadmissible evidence received without objection may properly be considered in determining the sufficiency of the evidence." *Id.* at 863. The Court then noted that the defendant was "reduced to arguing that the testimony of plaintiff's experts is so deficient in weight and credibility that it has little or no value on the issue of causation." *Id.* In its subsequent analysis of the weight to be given plaintiff's experts' testimony, however, the Court considered the scientific information that was the basis for the opinions, and the education and experience of the experts. *Id.* at 863–64. From the Court's discussion, it is clear the Supreme Court looked at the issues relevant to admissibility, i.e., the scientific foundation for the experts' opinions, when deciding the issue of submissibility. If *Callahan* was the last word on this issue by the Supreme Court, I would agree with Judge Stith's assertion that Mr. Butler's conviction should be reversed.

After *Callahan*, however, the Missouri Supreme Court revisited the issue of admissibility versus submissibility in *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611 (Mo. banc 1995), a medical malpractice case. In *Washington*, the plaintiffs claimed that the defendant hospital and doctors were negligent in failing to timely diagnose a placental abruption and timely perform a cesarean section. *Id.* at 612. After a jury verdict in favor of the plaintiffs, the hospital and doctors appealed, arguing, *inter alia*, that the plaintiffs failed to make a submissible case on the elements of negligence and causation. *Id.* at 615. The defendants contended that the opinion of the plaintiffs' expert, Dr. Hummer, was speculative and not supported by the evidence in the record. *Id.* The defendants argued that *Adams v. Children's Mercy Hosp.*, 848 S.W.2d 535, 548 (Mo.App.1993), and *Pippin v. St. Joe Minerals Corp.*, 799 S.W.2d 898, 904 (Mo. App.1990), "stand as authority for disregarding Dr. Hummer's testimony, even though admitted into evidence without objection, because lack of evidentiary foundation for an expert's opinion may be considered when determining submissibility." *Id.*

The Supreme Court rejected the defendants' argument. The Court stated that the defendants had confused the issue of the admissibility of the expert's opinion with the issue of the submissibility of the plaintiffs' case. *Id.* at 616. The Court also stated that it had discussed this issue in *Callahan*, and that "[i]f a question exists as to whether the proffered opinion testimony of an expert is supported by a sufficient factual or scientific foundation, the question is one of admissibility." *Id.* Any question regarding the factual or scientific foundation of an expert's opinion must be raised by a timely objection or a motion to strike. *Id.* Once the expert's opinion has been admitted, it can be relied upon to determine the submissibility of the plaintiff's case. *Id.* The jury determines the probative effect of the opinion. *Id.* Because the defendants did not challenge the scientific or factual foundation of Dr. Hummer's opinion at any time while he was testifying, the Court held that they waived any issue they had regarding the admissibility of his opinion and were foreclosed from raising the issue "under the guise of submissibility." *Id.* The Court then stated that "[t]o the extent that they indicate to the contrary, *Adams* and *Pippin* should not be followed." *Id.*

To appreciate the implications of the Court's overruling of *Adams* and *Pippin*, a discussion of *Adams* and *Pippin* is necessary. This court decided *Adams* in 1993. *Adams* was a medical malpractice case which arose out of a patient receiving excessive amounts of anesthesia prior to undergoing surgery. 848 S.W.2d at 538. One of the plaintiffs' theories of recovery was that the hospital was negligent because it assigned anesthesia cases on the day of the surgery to its doctors serving residencies. *Id.* at 546. The plaintiffs' negligence theory was that the hospital had a duty to post the assignments prior to the day of the surgery, and that its failure to do so caused or contributed in the injury. *Id.* At trial, the plaintiffs had relied on the expert opinions of two doctors to establish the hospital's duty to assign anesthesia cases the day before the surgery, and to establish that the hospital's failure to do so caused or contributed to the injury. *Id.* at 547. After a jury verdict in favor of the plaintiffs, the defendant hospital claimed on appeal that the plaintiffs failed to make a submissible case on the issue of its negligence in the way it made the anesthesia assignments. *Id.* at 546.

In ruling on this issue, this court examined the factual bases of the two experts' opinions. This court found that the plaintiffs had presented "no competent evidence" that the doctors involved in the case would have done anything differently had the hospital notified them earlier that they were assigned to the surgery. *Id.* at 548. Thus, this court concluded that the two experts' opinions that the hospital's failure to post the surgery schedule prior to the day of the surgery contributed to or caused the plaintiffs' injuries were speculative, and not supported by the evidence. *Id.* Citing *Pippin*, this court stated that "[a] medical expert's opinions must be supported by competent evidence which will give the opinion sufficient probative force to be substantial evidence," and that this principle holds true even where the expert's opinion is received without objec-

tion. *Id.* This court found that because the two experts' opinions lacked sufficient factual bases, they were "not sufficient to create a submissible case or to sustain a judgment." *Id.* Therefore, even though the two experts' opinions were admitted without objection, this court reviewed the factual bases for the experts' opinions when it reviewed the submissibility of the plaintiffs' case.

The court in *Adams* relied on *Pippin*. *Pippin* was a 1990 Southern District workers' compensation case. 799 S.W.2d 898. In *Pippin*, the claimant was the wife of an employee of St. Joe Minerals Corporation. *Id.* at 899. After the claimant's husband died, it was discovered that he had the occupational disease silicosis. *Id.* The Labor and Industrial Relations Commission denied the claimant's claim for workers' compensation benefits after finding that there was insufficient proof that the claimant's husband was exposed to the hazard of the disease in the course of his employment with St. Joe Minerals. *Id.* In determining whether the claimant had, in fact, sustained her burden of showing a reasonable probability that her husband had been exposed to silicosis in the course of his employment, the court reviewed all of her evidence. The court found significant the opinion of one of the claimant's medical experts as to the causal connection between her husband's working environment at St. Joe Minerals and the silicosis. *Id.* at 903. The expert had proffered this opinion in response to a hypothetical question posed by the claimant's attorney. In reviewing the expert's opinion, the court noted that at no time did the employer object to the hypothetical question or make a motion to strike the question or the expert's response. *Id.* at 904. The court stated that despite the employer's failure to object, the hypothetical question still had to be "predicated on facts in evidence and must not assume facts not in evidence." *Id.* This is so because "[a] medical expert's opinion must have in support of it reasons and facts supported by

competent evidence which will give the opinion sufficient probative force to be substantial evidence." *Id.* The court found that all but one of the hypothesized facts propounded to the claimant's expert had a sufficient factual basis. *Id.* The absence of a factual foundation for one of the hypothesized facts did not deprive the expert's opinion of its probative value, however, because that fact was not necessary to establish a claim under the applicable statute. *Id.* Thus, the expert's opinion provided "sufficient substantial evidence" to support the claimant's claim. *Id.*

According to *Adams* and *Pippin*, an expert's opinion, although admitted without objection, which lacks a factual foundation does not have sufficient probative force to constitute substantial evidence. *Adams* and *Pippin* stand for the proposition that even where an expert's opinion is admitted without objection, an appellate court can review the factual foundation of the expert's opinion in reviewing the submissibility of the case. This is directly contrary to the Supreme Court's holding in *Washington* that questions as to the factual or scientific foundation of an expert's opinion are questions of admissibility, and if not raised in a timely objection or a motion to strike, these issues are waived and cannot be raised on appeal in a submissibility claim. 897 S.W.2d at 616. The Court in *Washington* made a point of stating that *Adams* and *Pippin* should not be followed to the extent that they indicate anything contrary to its holding. *Id.*

Judge Stith says this case is different because, here, in Ms. Duvenci's own testimony, she admitted the state of scientific knowledge did not allow her to identify an individual, yet she nonetheless identified Mr. Butler as the source of the hairs found on the victim. She asserts that Ms. Duvenci's own testimony so undercut her opinion that it was entitled to no weight. While I understand Judge Stith's position, I do not agree. The true defect in Ms. Duvenci's positive identification and quantification testimony is its lack of a scientific foundation, not that it is so inherently contradictory that it is entitled to no weight. *Washington*, by its overruling of *Adams* and *Pippin*, prohibits consideration of the fact that Ms. Duvenci's positive identification testimony is unreliable, i.e. lacking in scientific foundation, in determining whether such evidence has sufficient probative force to constitute substantial evidence of Mr. Butler's guilt.

It should also be noted that unlike the Court in *Callahan*, the Court in *Washington* did not even mention the reliability or the scientific basis of the expert's opinion in reviewing the submissibility of the plaintiffs' case. *Id.* at 616–17. The Court in *Washington* simply set out Dr. Hummer's opinion, apparently taking it at face value, and relied on it to find that plaintiffs had made a submissible case. *Id.* While *Callahan* would allow the analysis and result the dissent desires to reach, I believe *Washington*, the last word from the Supreme Court, compels a contrary result. The precedent of *Washington* compels a finding that the evidence, including Ms. Duvenci's positive identification testimony, is sufficient to provide a reasonable juror with proof of Mr. Butler's guilt beyond a reasonable doubt.

Normally when there is no error preserved, an appellate court has discretion to consider, "[w]hether briefed or not, plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 30.20. For example, in *State v. Smith*, 944 S.W.2d 901, 915–16 (Mo. banc), *cert. denied*, 522 U.S. 954, 118 S.Ct. 377, 139 L.Ed.2d 294 (1997), the Supreme Court conducted plain error review when a defendant failed to challenge an expert witness's qualifications or object to his testimony. However, an appellate court will not review for plain error inadmissible evidence to which a defendant intentionally failed to object as a matter of trial strategy. *State v. Yager*, 416 S.W.2d 170, 172 (Mo.1967); *State v. Martin*, 852 S.W.2d 844, 851 (Mo.App.1992). *See also*

*State v. Meanor*, 863 S.W.2d 884, 892 (Mo. banc 1993) (Judge Robertson, in his concurring and dissenting opinion, argued for plain error review of the erroneous admission of the trooper's opinion testimony, but agreed that Rule 30.20 is not an invitation for appellate courts to rummage through trial transcripts in search of unpreserved error, and that Rule 29.15 is sufficient to address a trial counsel's failure to object to the admission of inadmissible evidence.).

In his briefs and his oral argument before this court en banc, Mr. Butler's counsel expressly stated that his failure to object to Ms. Duvenci's positive identification and quantification testimony was part of his trial strategy. Mr. Butler's counsel mistakenly believed that the proper challenge to the lack of foundation for Ms. Duvenci's testimony was to object that the evidence was not sufficiently reliable to permit submission of the case to the jury. He did not believe that it was necessary to dispute the admissibility of the evidence. Therefore, Mr. Butler's counsel decided not to object to Ms. Duvenci's testimony because he did not want it to look as though he was trying to hide something by objecting, and he thought he could discredit Ms. Duvenci's testimony on cross-examination.

Since Mr. Butler's counsel did not object to Ms. Duvenci's positive identification testimony, the issue of whether to admit that testimony was never presented to the trial court. It was not error, plain or otherwise, for the trial court to fail to reject, *sua sponte*, that evidence. Once the opinion testimony was in evidence, the trial court was correct, under the holding of *Washington*, in considering all of the evidence when determining the submissibility of the case.

By following the rule of law established by the Supreme Court in *Washington*, the result is an affirmance of the conviction based upon all of the evidence because there was no objection to the incompetent evidence, as a matter of trial strategy. Mr. Butler argues that a conviction upon evidence which was incompetent to prove guilt beyond a reasonable doubt violates Mr. Butler's rights. As Judge Robertson noted in his concurring and dissenting opinion in *Meanor*, 863 S.W.2d at 892, however, the constitutional rights of a defendant, such as Mr. Butler, are adequately protected by the availability of post-conviction relief under Rule 29.15. Under this rule, Mr. Butler has the ability to assert a claim of ineffective assistance of his trial counsel for failing to object to the admissibility of Ms. Duvenci's testimony. Any determination of whether Mr. Butler would have a valid claim for post-conviction relief, should such motion be filed, is properly left to future proceedings. Accordingly, I concur with Judge Lowenstein's conclusion that the evidence, including that admitted without objection, is sufficient to support a finding by a reasonable juror that Mr. Butler is guilty beyond a reasonable doubt.

LAURA DENVIR STITH, Judge, dissenting.

We respectfully dissent from the per curiam affirmance. We disagree with Judge Lowenstein's opinion that the evidence was adequate to allow a jury to find Mr. Butler guilty beyond a reasonable doubt. While we agree that Mr. Butler failed to preserve his objection to the admission of the expert's opinion that the hairs found on the victim matched Mr. Butler's hair beyond a reasonable doubt, we find that, under *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993), the question remains whether that aspect of her opinion testimony was so deficient in weight and credibility as to be entitled to little or no weight. We would find that it was entitled to no weight, since the expert admitted elsewhere in her testimony that the state of microscopic hair comparison is such that neither she nor other experts can state with certainty the likelihood that a hair will show up in a particular population, and that hair comparison analysis cannot be used to identify

a particular individual. As a result, her personal opinion whether the hair was Mr. Butler's to a reasonable certainty was entitled to no weight. In this respect, we disagree with all the concurring opinions. In all other respects we agree with Judge Breckenridge's opinion that the remaining evidence showed only that Mr. Butler lived in the same trailer park as the victims, was familiar with the trailer park, and had hair which was not inconsistent with hairs found on the victim, one of which had spots that looked like the spots found on one of the victim's hairs. Contrary to Judge Lowenstein's opinion, and like Judge Breckenridge, for the reasons detailed below we do not find that this provides a sufficient factual basis for the jury to find beyond a reasonable doubt that Mr. Butler was the perpetrator of the crime.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Because the facts allegedly identifying Mr. Butler as the perpetrator are essential to the resolution of this appeal, we restate the factual back ground of this appeal in detail, viewing the evidence in the light most favorable to the verdict. *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995). So viewed, the evidence shows that, at approximately 9:30 p.m. on the evening of August 31, 1993, two boys, sixteen-year-old J.L. and thirteen-year-old N.E., were sitting by a lake and boat storage area at the Lakeview Terrace Mobile Home Court in Clay County where they lived. A man walked by a couple of times and asked them whether they had seen someone waiting around who was supposed to help him take his boat out of storage. When the boys told him they had not, the man left. The man later came back, and offered to pay them money to help him get his boat ready to take to the lake. J.L. and N.E. agreed, and the man left again after telling the boys he was going to his house to get the combination to unlock the boat storage area. He returned five to ten minutes later and told the boys he could not find the combination,

but he knew where they could jump over the fence.

J.L. and N.E. began walking through a wooded area around the fence and the man followed behind. As they were walking, the boys heard the man ask, "Who is going to be the hero?" J.L. and N.E. turned around and saw that the man had a gun in his hand. He told the boys that, if they cooperated, they would be all right. The man ordered N.E. to lay on the ground, and ordered J.L. to lay on top of N.E. The man tied J.L.'s hands behind his back with a rope, moved him onto the ground next to N.E., and tied N.E.'s hands behind his back. The man had anal intercourse with J.L.

While the boys were on the ground, N.E. tried twice to look at the man's face; however, the man told N.E. to turn his head and pushed N.E.'s head away. While the man was still sodomizing J.L., N.E. jumped to his feet and ran. As N.E. was running away, the man told him to stop or he would shoot him, but N.E. escaped. After briefly chasing N.E., the assailant turned around and came back to J.L. He untied J.L., told him not to say anything, and ran away. N.E. went to the house of a friend whose father was a police officer. The friend's father reported the incident to the police. J.L. ran to his own home. Ten minutes after he arrived home, the police came. A crime scene technician collected his clothing, which was new and had never been worn before that day. The police recovered an unidentified head hair from J.L.'s shirt and an unidentified pubic hair from J.L.'s underwear.

The following year, Mr. Butler, who lived in the same mobile home park, became a suspect. In April of 1995, 20 months after the crime occurred, the police collected hair and blood samples from Mr. Butler. Mr. Butler was subsequently indicted on one count of forcible sodomy, one count of felonious restraint, and two counts of armed criminal action.

Mr. Butler's first trial on these charges ended in a mistrial. The second trial took place on July 22–24, 1996. Both N.E. and J.L. testified regarding the assailant's appearance. N.E. testified that the assailant was a man about 30 years old, of average weight, roughly five feet ten inches tall, with a couple of days' beard stubble on his face, wearing a ball cap with black letters on the front, and a Jack Daniels T-shirt.

In contrast, in his initial statement to police right after the incident, J.L. had described the assailant as being a stocky-built white male, twenty to thirty years old, five feet seven inches tall, weighing approximately 170 pounds, with brown curly hair which extended "a little bit" beyond the ball cap in front, with a couple of days' beard stubble on his face, and wearing a Jack Daniels T-shirt and a silver wristwatch with a metal wristband. At trial, J.L. gave a more general description, stating that the assailant was five foot seven or eight, wearing dark clothing and a baseball hat.

At the time of the trial, Mr. Butler was 32 years old, five feet nine inches tall, 185 to 190 pounds in weight, with straight brown hair, a rather severe receding hairline, and a mustache. The State offered no evidence that he had ever had curly brown hair, that he recently gained weight, that he had clothing or a watch matching that worn by the perpetrator, or that he had a boat in the boat storage area or had a combination to the lock to the boat storage area. He said he did not. Neither N.E. nor J.L. could identify Mr. Butler by sight or voice as the assailant. On the other hand, Mr. Butler lived in the trailer park and was familiar with it, and he admitted that he was in the park – he said he supposed he was in his trailer – at the time of the crime. He had no witnesses to his whereabouts. And, like the perpetrator, he could be described as being of average height and weight and about 30 years old.

In addition to the boys' testimony and the general testimony about Mr. Butler's appearance and where he lived, the State offered the expert testimony of Darvine Duvenci. Ms. Duvenci was employed by the Regional Crime Lab in Kansas City, where she worked in the trace evidence and serology section of the chemistry department. Her work with trace evidence involves the analysis of microscopic items of evidence such as hair, fibers, paint chips, glass, and other materials, while serology involves the genetic analysis of body fluids. Ms. Duvenci had been a forensic chemist for twelve years, and estimated that she performed approximately 100 hair comparisons a year.

Ms. Duvenci testified as to the limitations of comparative microscopy of hair. She stated unequivocally that such use of such comparisons to positively identify individuals is *not* accepted by the scientific community as reliable. Ms. Duvenci testified that, while she is able to state that hair from an unidentified individual "matches" the hair of an identified individual, she is unable to determine what percentage of the population could have contributed the unidentified hair. Thus, according to Ms. Duvenci, the state of the science of microscopic hair comparison is such that experts cannot state that a person with a certain type of hair characteristics will show up a certain number of times in the population.

Ms. Duvenci was then asked to give her opinion about her microscopic comparison of the one unidentified head hair and the one unidentified pubic hair found on J.L.'s clothing with the samples of head, pubic and facial hairs from Mr. Butler. She said she was unable to find any significant differences between characteristics in the unidentified head and pubic hair found on J.L.'s clothing and the sample head and pubic hair collected from Mr. Butler that would cause her to exclude Mr. Butler as the source of the unidentified hair. She testified that, were she to interchange the unidentified head and pubic hair with those of Mr. Butler, she would not be able to distinguish them.

Ms. Duvenci also testified that Mr. Butler's pubic hair sample and the unidentified pubic hair found in J.L.'s underwear had spots on the medulla, and that she could not remember previously finding such spots in her examination of over 1200 hair samples. She also testified that in her personal experience with hair comparisons, she could not recall finding two unidentified hairs from totally different body regions of a person that both matched hairs from those same parts of the body of another person. According to Ms. Duvenci, this finding of a match of both a pubic hair and a head hair was "like double significance of evidence." She did not suggest that scientific studies or the state of the scientific art supported giving such a "double significance" to this evidence, however. Rather, she acknowledged that neither she nor forensic scientists in general were able to positively identify individuals based on hair comparison. She thought two matches were twice as meaningful.

Despite testifying the scientific community does not accept use of hair comparison evidence to identify a particular person, Ms. Duvenci went on to state that she felt there was a "very strong probability" that the two unidentified hairs collected from J.L. came from Mr. Butler. And, when asked by the prosecutor whether she believed "within a reasonable degree of certainty" that the unidentified hairs were in fact from Mr. Butler, Ms. Duvenci answered in the affirmative.

In his defense, Mr. Butler testified that he did not commit the crimes, and he offered evidence that he did not fit the description of the assailant. When asked if the hairs were his, was there a way they could have gotten on J.L., he said that he would typically swim on Tuesdays, since that was the day he took classes, and so it was his only day off work. He recalled that on Tuesday, August 31, a boy had gotten a gash on his forehead while roughhousing, and had to have the cut treated. He said he recalled the incident because he had not seen someone get a cut on the head at the pool ever before, and that the boy who got the cut looked like J.L. He said he supposed it possible hair was transferred to the victim either while they were both swimming and the roughhousing was occurring in the pool, or that hair from his towel was transferred to the victim since people had put their towels in the same area of the pool. He had gone to class that night and assumed he had had returned home after class ended at 9:50 p.m. that night.

The trial court denied Mr. Butler's motion for acquittal, and submitted the case to the jury. The jury convicted Mr. Butler on all counts and he was sentenced as a prior and persistent offender under §§ 558.016 and 557.036 RSMo 1994. Mr. Butler timely filed this appeal.

## II. LEGAL INSUFFICIENCY OF EVIDENCE TO SUPPORT CONVICTION

On appeal, Mr. Butler raises errors in regard to the jury instructions and in regard to improper admission of evidence of uncharged misconduct, and further argues that the evidence was insufficient to submit the case to the jury. It is as to the concurring opinions' resolution of the sufficiency of the evidence issue that we dissent.

### A. Standard of Review

In reviewing the sufficiency of the evidence to support a guilty verdict, it is not our function to reweigh the evidence, *State v. Martin*, 940 S.W.2d 6, 8 (Mo.App.1997), or to act as a " 'super juror' with veto powers." *State v. Grim*, 854 S.W.2d 403, 414 (Mo. banc 1993). This Court is, rather, charged with the responsibility of determining whether all of the evidence, direct and circumstantial, is sufficient to provide any rational juror with proof beyond a reasonable doubt of each of the elements of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Grim*, 854 S.W.2d at 405; *State v. Kee*, 956

S.W.2d 298, 300–01 (Mo.App.1997). Because the evidence is weighed by the jury, not the reviewing court, we examine the evidence and inferences in the light most favorable to the verdict. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *State v. O'Brien,* 857 S.W.2d 212, 215–16 (Mo. banc 1993). In doing so, we "disregard contrary inferences, unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them." *Grim,* 854 S.W.2d at 411. Thus, our review of the submissibility of the State's case "impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson, Id.* at 319, 99 S.Ct. 2781.

### B. Evidence of Hair Comparison Analysis.

The State and Judge Lowenstein principally rely on the testimony of Ms. Duvenci regarding the results of her microscopic comparison of the two hairs recovered from J.L.'s clothing with Mr. Butler's hair samples. We completely agree with Judge Lowenstein and Judge Breckenridge that competent hair comparison evidence is admissible in Missouri in a criminal trial, *State v. Hoard,* 715 S.W.2d 321, 325 (Mo. App.1986), and is probative of guilt. Its probative value has limitations, however, limitations even Ms. Duvenci recognized, but which Judge Lowenstein does not.

It was Ms. Duvenci herself who testified that microscopic hair comparison analysis *cannot* positively identify individuals, but can only reduce the possible group of suspects by eliminating an individual. To this extent, she testified, hair comparisons are not conclusive in the same way as are fingerprints or DNA comparisons, for which the probabilities of two person having the same characteristics are infinitesimal, because there are not enough individual features in human hair to provide conclusive identifications.

In fact, as Judge Breckenridge notes in her opinion, Ms. Duvenci testified that there are only three possible conclusions she can draw from comparing a known hair sample, such as Mr. Butler's, with an unknown hair sample: (1) that the hairs are not similar; (2) that no conclusion is possible; or (3) that the hairs match based on microscopic characteristics, and that they therefore either originated from the same person or from another person whose hairs exhibit the same microscopic characteristics.

Ms. Duvenci further testified, in fact, that while she is able to state whether hair from an unidentified individual "matches," that is, is consistent with, the hair of an identified individual, she is unable to determine what percentage of the population could have contributed the unidentified hair. According to Ms. Duvenci, the state of the art in analysis of microscopic hair comparisons is such that experts cannot state that a person with certain types of hair characteristics will show up a certain number of times in the population. While attempts to quantify the probabilities in human head and pubic hair have been made, *see, e.g.,* B.D. Gaudette, *Some Further Thoughts on Probabilities and Human Hair Comparisons,* 23 J. FORENSIC SCI. 758, 760 (1978), Ms. Duvenci herself testified, and the experts agree, that those statistics have not been accepted in the scientific community. *See* Clive A. Stafford Smith & Patrick D. Goodman, *Forensic Hair Comparison Analysis; Nineteenth Century Science or Twentieth Century Snake Oil?,* 27 COLUM. HUM. RTS. L. REV. 227 (1996); P.D. Barnett & R.R. Ogle, *Probabilities and Human Hair Comparison,* 27 J. FORENSIC SCI. 272, 278 (1982). Without the ability to quantify probabilities, the scientific community cannot determine the significance of the match of two hairs, *See* Barnett & Ogle, *supra,*[1] and has not even established a uni-

---

1. Thus, as Barnett and Ogle stated in discussing the difficulty of determining the weight to attribute to evidence of hair comparison:

If the evidence and the standard [to which it is compared] share common attributes suggesting they have a common source,

form set of features or characteristics to examine when making hair comparisons. And, in making hair comparisons, the examiner forms a subjective, rather than objective opinion.

Much of Ms. Duvenci's testimony as to the state of the science of hair comparison is consistent with the testimony of other experts in Missouri cases. Thus, in previous Missouri cases in which expert testimony was offered regarding microscopic hair comparison between the defendant's hair and unknown hairs found at the crime scene, experts expressed the results of their comparisons in terms of the defendant's hair and the unknown hair being "similar," Hoard, 715 S.W.2d at 325; "indistinguishable," State v. Bland, 757 S.W.2d 242, 244 (Mo.App.1988), or that they "matched," State v. White, 621 S.W.2d 287, 292 (Mo.1981). Some experts attempt to focus their testimony further by stating, for instance, that defendant was part of a "very small part of the population" that could match the sample so that defendant was "a possible contributor [of] that hair," State v. Marlow, 888 S.W.2d 417, 421 (Mo. App.1994), and one expert, unlike Ms. Duvenci, said that statistical comparisons could be made and that 1 in 850 persons would have had hair matching the sample in that case. State v. Andrews, 770 S.W.2d 424, 426 (Mo.App.1989).

And, as Judge Lowenstein notes, in State v. Jones, 777 S.W.2d 639, 641 (Mo.

App.1989), the expert was permitted to testify that he (like Ms. Duvenci) saw spots on both the defendant's hair and the comparison hair, and he (like Ms. Duvenci) said it was not common to find such spots, and that "in his experience he had found this condition in one or two percent of the hairs he had examined." Id. Defense counsel argued it was error to admit this testimony, because the scientific community did not recognize such spots as a basis for identifying the source of the hair. Jones disagreed because the expert did not purport to claim that he could state the probability that the hair came from defendant. State v. Jones, 777 S.W.2d 639, 641 (Mo.App.1989). He just stated the percentage of black spots he had seen in his experience, a factual matter as to which he was competent to testify.

Here, as in Jones, Ms. Duvenci was permitted to testify that she saw spots on his pubic hair and that she, too, found them unusual in her experience – in fact, it was the first hair with spots she had seen. Under Jones, we agree, this testimony was admissible. What distinguishes the evidence in this case from that in Jones and the other cases cited above, however, is that Ms. Duvenci then went on to testify that the fact that both Mr. Butler's head and pubic hairs matched the unidentified head and pubic hairs had "double significance," and that she went on to state that she thought there was a strong probability

---

they are said to match. Once the evidence and standard are determined to match, a decision must be made as to the significance of this finding.

The significance of the match between two objects requires knowledge about the frequency of occurrence of the measured attributes in the population. If the set of measured attributes occurs only in a single individual in the population, then the match results in individualization (the conclusion that the evidence could have originated only from the same source as the standard.) On the other hand, if the set of measured attributes occurs in a large portion of the population, the fact that the evidence and standard match is of little significance.

A primary task facing criminologists in the evaluation of associative evidence is the determination of those attributes of the physical evidence useful to the task of individualization. In order to be useful the attributes must be capable of measurement and not shared by the entire population. If these attributes can be identified (that is described and measured), and if the frequency of occurrence of the attributes in the population can be determined, then, in principle, probability estimates can be made to assist in evaluating the significance of the evidence. These probability estimates are used to determine the degree of certainty that the evidence originated from the same source as the standard.
Barnett & Ogle, supra, at 272–73.

that the two hairs came from the defendant, and that within *"a reasonable degree of certainty"* she believed *"the unknown hairs actually came from the defendant."* These opinions were essentially a positive identification of Mr. Butler derived from the hair evidence. *State v. Faircloth,* 99 N.C.App. 685, 394 S.E.2d 198, 202–03 (1990).

Ms. Duvenci so testified despite her previous admission that the scientific community did not support such a conclusion based on hair comparisons, and despite the fact that it went beyond her personal factual experience and beyond the principles accepted in the scientific community. She did what the expert in *Jones* had avoided doing – she stated that based on her experience and contrary to the rest of the scientific community, she could say to a very strong probability and could say to a reasonable certainty that the hairs came from Defendant. The State repeatedly emphasized this testimony in closing argument. It was the key basis of its case, for, without it, the evidence simply showed an average sized man with curly hair who lived in or was familiar with the trailer park was the perpetrator, and that the perpetrator had hair which, under a microscope, matched that of Mr. Butler. This would not provide a basis to find Mr. Butler guilty beyond a reasonable doubt.

Judge Lowenstein suggests that such testimony is proper under *State v. White,* 621 S.W.2d at 292–93. That case, however, simply stated that Missouri courts will permit introduction of evidence that two hair samples *match,* that is, that they are indistinguishable from each other, and we agree that Ms. Duvenci was properly permitted to testify as to whether the sample hairs taken from Mr. Butler matched those found on the victim. If the hairs did not match, then Mr. Butler would have been exculpated and we would not be considering this appeal.

The issue raised by the dissent is whether any weight should be given to Ms. Duvenci's further conclusions that the fact

that two hairs "matched" had "like double significance," and that the matches caused her to conclude that Mr. Butler was very probably the source of the hairs and that the hairs were his to a reasonable degree of certainty. The latter is a very different issue, and *White* in no way permits admission of the latter statements.

Judge Lowenstein also cites *State v. Kleypas,* 602 S.W.2d 863, 870 (Mo.App. 1980), as if it supported admission of Ms. Duvenci's testimony that the hairs very probably came from defendant and that they came from him beyond a reasonable doubt. Again, that case simply does not so hold. In *Kleypas,* defendant was accused of kidnapping and killing the victim. The evidence against him included evidence that footprints in fresh snow led from the back door of defendant's home to the home of the victim, and back again, and that there were no other footprints in the snow there. 602 S.W.2d at 865. The evidence also showed that the tread on defendant's boots matched the tread of the tracks in the snow between the houses. In addition, defendant admitted that a vodka bottle found along the route of the footprints was his. *Id.* Finally, there was evidence that a bite mark found on the victim matched the bite mark made by defendant's teeth. There, as here, the expert then testified that it was his opinion to a reasonable certainty that defendant had made the bite marks.

Defendant objected to the bite mark evidence in *Kleypas* on a basis similar to that raised here – that the state of scientific knowledge in the area of bite mark comparison did not permit bite marks to be used to identify a particular individual. However, and as Judge Breckenridge notes in her opinion, Judge Lowenstein is incorrect that *Kleypas* approved of admission of this testimony or held that the evidence would not have been sufficient without it. To the contrary, the court noted that the "reasonable certainty" testimony was only elicited on cross-examination, and that even if objection to it should

have been sustained, there was no error here since defendant had tried to exclude all of the expert's bite mark testimony, not merely the part that purported to identify the bite mark as that of defendant. *Kleypas*, 602 S.W.2d. at 870. Moreover, the court noted that *Kleypas* (unlike *Butler*) was a court tried case, and specifically concluded:

> In all events, in its careful and explicit findings of fact, the trial court clearly indicated that it considered only the testimony that the bite marks were consistent with and compatible with the defendant's teeth. The defendant could not have been prejudiced by the testimony last referred to. Excluding the evidence of reasonable medical certainty, the evidence was clearly sufficient to support the conviction.

*Id.*

Finally, Judge Lowenstein cites *State v. Maxie*, 513 S.W.2d 338, 344 (Mo.1974), for the proposition that an expert can testify that he finds it "highly probable" that certain fibers he examined came from a particular shirt, without explaining the statistical basis for comparing the fibers. Judge Lowenstein apparently intends to subtly suggest by this reliance that Ms. Duvenci's testimony that she thought there was a very strong probability that the hairs came from Mr. Butler and that the fact that hairs from two parts of the body matched had "like double significance" would also be admissible under Missouri law, even if objected to, without a showing that such evidence was accepted by the relevant scientific community, and thus, even if the objectionable opinion that the hairs were Mr. Butler's to a "reasonable certainty" were ignored, there would be sufficient evidence to support the verdict.

*Maxie* does not support that proposition. First, *Maxie* involved shirt fibers, not hairs, and the expert testified as to the individual effects caused by what bolt of cloth was used, the age of the fiber, how often it had been laundered, and so forth, which caused him to believe the fibers

came from a particular shirt. The opinion does not address use of hair comparison testimony.

Second, and even more basically, the opinion in *Maxie* nowhere states whether or not the fiber expert had testified to the existence of supporting studies, or to whether his methods and the principles he applied were accepted in the relevant scientific field. It is silent on the issue and, so far as the opinion shows, the issue whether the expert's principles and methodology were accepted in the field simply did not arise. The only issue addressed in *Maxie* as to the fiber expert's opinion is whether it was admissible despite the fact the expert spoke in terms of probabilities rather than absolute certainties. The court just says that absolute certainty is not required, and of course we agree.

Finally, nothing in *Maxie* even hints that the court thereby intended to overrule *Frye sub silencio* and to hold for the first – and only – time that expert testimony is admissible in Missouri even if it is not generally accepted in the relevant scientific field. Yet, that is what Judge Lowenstein's reliance on *Maxie* appears to suggest, for it is not relevant to the instant case unless Judge Lowenstein intends to indicate by citing *Maxie* that it is acceptable in Missouri for an expert to just testify to probabilities without regard to whether that testimony is supported by scientific studies or principles accepted in the expert's field, even over objection. Such a principle, would, of course, be inconsistent with Missouri law.

In sum, like Judge Breckenridge and unlike Judge Lowenstein, we conclude that neither *White, Kleypas, Maxie,* nor any Missouri case suggests that a submissible case can be made based solely on hair comparison testimony, nor do they support admission of expert testimony which purports to state that a particular hair came from a particular person and identifies that person beyond a reasonable doubt. Nothing in Missouri law allows such "opin-

ions" to be given any weight in determining whether a submissible case was made, as discussed below. It is for this reason that the dissenting judges would find that the State failed to make a submissible case.

We do agree with Judge Lowenstein and Judge Breckenridge that Mr. Butler waived his right to raise the inadmissibility of this evidence because he did not object to the foundation for Ms. Duvenci's opinion that, to a reasonable degree of scientific certainty, the unknown hairs found on J.L.'s clothing came from Mr. Butler. And, as they note, the general rule is that, when an expert's opinion comes into evidence without objection and there is a factual basis for the opinion, then the weight of the opinion evidence is normally for the jury. *See State v. Guyton*, 635 S.W.2d 353, 360 (Mo.App.1982). We agree with this rule.

We further agree with the application of this rule in *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993), which held that attacks on the *foundation* for an expert's testimony under the test set out in *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923), must be made at the time the expert's testimony is sought to be admitted, because *Frye* sets the standard for *admissibility, not submissibility*, of expert testimony. *Callahan* thus held that, by failing to object to the admission of an expert's testimony, the defendant in *Callahan* had waived any objection to the foundation for that testimony under *Frye*.

We disagree, however, with their further conclusion that Mr. Butler's failure to challenge the lack of *foundation for admission* of Ms. Duvenci's testimony under the *Frye* test automatically precluded Mr. Butler from attacking the weight and reliability of that testimony in arguing that a submissible case was not made. In fact, as Judge Breckenridge recognizes in her opinion, *Callahan* specifically held that, even though the defendant in that case had waived *Frye* foundational objections by failing to object to admissibility of the

expert's opinions, and even though this meant that her testimony could properly be considered in determining the sufficiency of the evidence, *defendant could still argue that the testimony was "so deficient in weight and credibility that it has little or no value on the issue of causation."* *Callahan*, 863 S.W.2d at 863 (emphasis added).

This distinction between foundational objections and objections based on a fundamental lack of weight or credibility makes sense. As prior cases have noted, "foundational deficiencies can frequently be remedied" in response to an objection at trial. *State v. Blue*, 875 S.W.2d 632, 633 (Mo.App.1994). Because this is the case, it would be unfair to allow a party to "sandbag" a witness by failing to object to correctable foundational errors in the witness' testimony at the time of admission, and to permit the party to delay objection until submission, when it may be too late to correct the foundational errors. In fact, *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 616 (Mo. banc 1995), cites *Callahan* and applies this rationale in support of its ruling.

This rationale for the requirement of an objection contemporaneous with admission of the expert's testimony does not apply where the error is not a foundational one which is subject to correction, however, but rather is one which goes to a fundamental inconsistency in the testimony itself, a flaw which could not be rectified whenever an objection was made, and which makes the opinion inherently unreliable and consequently entitled to little or no weight.

Thus, for instance, the mere fact that an expert testified, without objection, that there was no gravity, so people could fly, would not require the court to submit a case to the jury which required a finding that people could fly. In such a case, the court could hold that the testimony was so deficient in weight, reliability and probative value as to be entitled to no weight in

determining submissibility, even though it had been admitted without objection and even though the weight to be given expert testimony is usually for the jury. This is the distinction *Callahan* calls on us. to make.

*Callahan*, of course, was a civil case, in which the standard of proof was the preponderance of the evidence. Here, we are dealing with a criminal case, in which the standard is proof beyond a reasonable doubt. While it is normally up to the jury to determine whether the admitted evidence meets this standard, where the evidence to be considered is so lacking in weight and probity that no reasonable juror could find that it meets the reasonable doubt standard, then a submissible case has not been made and the case should not be submitted. *See, e.g., State v. Johnson*, 504 S.W.2d 334, 335 (Mo.App.1973) (doctor's testimony as to autopsy, admitted without objection, was entitled to no probative value where doctor admitted he had never conducted autopsy). *Cf. State v. Smith*, 944 S.W.2d 901 (Mo. banc 1997); *State v. Biddle*, 599 S.W.2d 182, 188 (Mo. banc 1980) (both considering reliability of expert opinion as plain error, even though not objected to or admission stipulated to, since stipulations as to law are not binding on court).

In applying these principles to the facts of this case, we would find that the objection to Ms. Duvenci's expert opinion that Mr. Butler is very probably the source of the unknown head and pubic hairs found on J.L.'s clothing, and that he is the source to a reasonable degree of scientific certainty, and that the match of two hairs was "like double significance," is not merely one of foundation. It is apparent from her testimony that she simply gave her own personal opinion of the identity of the perpetrator based on the frequency of her observation of these characteristics in her own previous hair comparisons, not upon any accepted standard in the scientific community, and in the face of her explicit recognition that the scientific community believes that hair comparison evidence cannot in fact be used to identify a particular person with certainty.

Contrary to the concurring opinions' characterization of this issue, it is not simply an issue of lack of adequate statistical foundation for Ms. Duvenci's opinion, nor is it a situation in which she used a proper technique and we merely believe she reached the wrong result in interpreting it. Rather, she admitted that her conclusions that the hair was very probably Mr. Butler's hair and that it was his beyond a reasonable doubt were conclusions which she could not reach based on the state of scientific knowledge in her field of expertise. The scientific community says that identifications cannot be made based on hair comparison, she herself so testified and agreed that this was the view of those in her field, and her own view. The technique she used, while sufficient to allow her to determine whether hairs are similar, was admittedly not a technique which the scientific community believed could be used to identify a particular individual.

Yet, Ms. Duvenci used this technique for this purpose, without ever suggesting that she believed that those in her field were wrong, or offering some other scientific or medical basis for her views as to Mr. Butler's guilt. She simply offered her personal, not her expert, opinion that the hair comparison identified Mr. Butler based on her own anecdotal observations that some characteristics of hairs are more unusual than others, and that matching spots are so unusual that she had not seen them before. Even though admitted and available for the jury's consideration, her identification opinions, not being based on her expertise or on accepted scientific techniques for identification, are entitled to little or no weight on the issue of whether the hairs found on the victim actually were the Defendant's hair. Otherwise, there is a danger that "[t]he uncritical use of [flawed] probability estimates can easily distort the value of hair evidence, particularly when presented to a lay jury hearing

evidence that involves hair identification and could lead to a miscarriage of justice when hair evidence plays a prominent role in a case." Barnett & Ogle, *supra*, at 277.

Because, while relevant, hair comparison evidence cannot be used to identify a particular individual, courts in other jurisdictions have found that such evidence, by itself, is insufficient to provide proof beyond a reasonable doubt. *Jackson v. State*, 511 So.2d 1047, 1050 (Fla.App.1987), reversed defendant's convictions of first-degree murder and armed criminal action on the basis that there was insufficient evidence to support the convictions. In *Jackson*, the state presented evidence concerning head hairs taken from the victim's pajama top. *Id.* at 1048. The state's expert in hair and fiber analysis testified that two of the head hairs taken from the victim were indistinguishable from defendant's head hair sample. *Id.* The state's expert indicated, however, that "hair will never get unique enough to be like a fingerprint" and admitted that "hair comparisons do not constitute a basis for positive personal identification." *Id.* at 1049. In reversing defendant's conviction, *Jackson* held that, although hair comparison testimony is admissible, it cannot provide an identification with absolute certainty by itself. *Id.*

The Court of Appeals of North Carolina has also addressed this issue on more than one occasion. In *State v. Stallings*, 77 N.C.App. 189, 334 S.E.2d 485, 486 (1985), defendant was convicted of armed robbery solely on the basis of hair comparison evidence which indicated that his hair was microscopically consistent with the hair found in the mask used during the robbery. The court held that "[u]nlike fingerprint evidence ... comparative microscopy of hair is not accepted as reliable for positively identifying individuals. Rather it serves to exclude classes of individuals from consideration and is conclusive, if at all, only to negative identity." *Id.* Therefore, *Stallings* reversed defendant's con-

viction. *Id.* at 487. This position was reaffirmed in *State v. Johnson*, 78 N.C.App. 729, 338 S.E.2d 584, 587 (1986).

*People v. Gomez*, 215 Ill.App.3d 208, 158 Ill.Dec. 709, 574 N.E.2d 822, 823 (1991), also reversed a first-degree murder conviction because there was insufficient circumstantial evidence to establish the defendant's guilt beyond a reasonable doubt. There was evidence of defendant's fingerprint at the murder scene, a place where he paid his monthly rent, as well as samples of blood and paint taken from the murder scene and the defendant's residence. The state also introduced, as part of its case in chief, hairs found on the victim's body which shared some similarity with the defendant's hair. *Id.* at 826. The court held that hair samples "do not possess the necessary unique qualities of fingerprints to allow positive identification." *Id.* at 828. "The mere physical probabilities inferred from ... hair ... samples alone are insufficient to sustain a conviction beyond a reasonable doubt." *Id. See People v. Brown*, 122 Ill.App.3d 452, 77 Ill.Dec. 684, 461 N.E.2d 71, 74 (1984). Because the court found that the circumstantial evidence was insufficient to prove guilt, the court reversed defendant's conviction.

In dismissing the persuasive cases from other jurisdictions which have addressed this issue, Judge Lowenstein claims that, while in many cases hair comparison evidence, standing alone, will not make a submissible case, the hair evidence in this case is sufficient to make a submissible case because the expert here has twelve years of experience in the field of hair comparisons, and her opinion that certain characteristics were "very unusual" or "very rare" in her experience makes the evidence more compelling. Judge Lowenstein argues that, once evidence of guilt is admitted, the jury's finding that the evidence constituted proof beyond a reasonable doubt in effect answers the question of submissibility for this Court.[2]

**2.** Judge Lowenstein also cites cases from oth-

er jurisdictions which apparently have per-

This argument ignores the fact that no amount of experience in hair comparisons by Ms. Duvenci could overcome the rest of her testimony, in which she herself recognizes the objective fact that hair comparisons *cannot* positively identify individuals, but can *only* reduce the possible group of suspects by eliminating an individual. This Court has a duty to ensure the protection of a defendant's due process rights by determining *whether the evidence of guilt is sufficient so that any reasonable juror could have found the defendant guilty beyond a reasonable doubt. Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *Grim,* 854 S.W.2d at 405. To do otherwise would be, essentially, to affirm automatically a finding of submissibility, regardless of how uncertain and speculative the evidence might be, simply because a jury returned a guilty verdict. The Missouri Supreme Court has stated, however, that "any guilty verdict subsequently rendered by the jury is wholly irrelevant to the question of whether the case was sufficient to go to the jury at all." *O'Brien,* 857 S.W.2d at 215.

In contrast to Judge Lowenstein, Judge Breckenridge agrees that, if *Callahan's* distinction between the foundation of an expert's opinion, and its reliability and weight, were still good law, then Mr. Butler's appeal should be successful because Ms. Duvenci's testimony that the hair was Mr. Butler's to a reasonable degree of certainty is entitled to no weight and is not reliable. She concludes, however, that *Callahan's* distinction between an attack on the foundation for expert testimony and an attack on its weight and reliability must have been overruled *sub silencio* in the Missouri Supreme Court's later decision in *Washington,* 897 S.W.2d at 616.

As Judge Breckenridge's opinion discusses at greater length, *Washington* reaffirmed the holding in *Callahan* that the

issue whether "proffered opinion testimony of an expert is supported by a sufficient factual or scientific foundation" is one of admissibility, not submissibility. *Washington,* 897 S.W.2d at 616. Thus, where, as in *Washington,* and as in the instant case, an expert's opinion has been admitted without objection, it can be considered by the jury in determining submissibility, even if the foundation for the opinion would have been subject to attack if properly objected to at the time of admission. *Id.*

We further agree with Judge Breckenridge that *Washington* recognized that its holding was contrary to the holdings in two previous Missouri Court of Appeals cases, *Adams v. Children's Mercy Hosp.,* 848 S.W.2d 535, 548 (Mo.App.1993), and *Pippin v. St. Joe Minerals Corp.,* 799 S.W.2d 898, 904 (Mo.App.1990), and that *Washington* specifically disapproved of the way in which those cases considered admissibility "under the guise of submissibility," and held that, to the extent they did so, *Adams* and *Pippin* were no longer to be followed. *Washington, Id.* at 616.

Judge Breckenridge then concludes that *Washington* must also have impliedly overruled *Callahan* to the extent it said that reliability and weight can be argued even when admissibility is not objected to, for *Washington* further noted that weight and submissibility are generally for the jury. *Washington,* 897 S.W.2d at 616. It is here that the dissenting judges and Judge Breckenridge disagree.

As is clear from *Washington's* disapproval of *Adams* and *Pippin,* two previously leading cases, our Supreme Court does not mince words when it wishes to overrule prior decisions with which it disagrees. Yet, rather than stating it disapproved of *Callahan's* distinction between attacks on foundation and attacks on reliability, it specifically cited *Callahan* with

mitted testimony, even over objection, that a hair match identifies a defendant to a reasonable certainty. As Judge Breckenridge's opinion notes, Missouri follows the *Frye* test and

does not permit such testimony to be admitted if properly objected to. Thus, Judge Lowenstein's reliance on these cases is not persuasive.

approval for its recognition of the distinction between attacks on admissibility and submissibility. This indicated the Court was well aware of its prior decision in *Callahan*. If *Washington* had wanted to disapprove of *Callahan's* statement that courts can consider whether an expert's opinion "is so deficient in weight and credibility that it has little or no value on the issue of causation," *Callahan*, 863 S.W.2d at 863, even if no objections were made to the admissibility of the testimony, it could and would have done so, in the same way that it disapproved of *Adams* and *Pippin*. By failing to do so, *Washington* instead appears to reaffirm *Callahan's* distinction between objections to the *foundation* for an expert's opinion, which is an issue relevant only to admissibility, and objections to the *weight and reliability* of that testimony, which is relevant to submissibility.

For these reasons, we would find that the reliable opinion evidence from Ms. Duvenci, which is entitled to weight in determining the sufficiency of the evidence, is that the head and pubic hairs found on J.L.'s clothing match the sample of Mr. Butler's head and pubic hairs, and the unknown hairs originated from Mr. Butler or another person whose hairs exhibit the same microscopic characteristics and that in her personal experience it is unusual to find spots on the hairs as she found here. We would not find this to be sufficient in itself, or when considered in combination with the other circumstantial evidence, to support his conviction.

*C. Sufficiency of Evidence of General Description and Familiarity with Location of Crime*

In order to determine whether a submissible case was made, we review all of the evidence connecting Mr. Butler with these crimes, and consider whether it, when added to the valid expert testimony that the hairs matched and that Ms. Duvenci had not seen spots on the medulla in her prior extensive experience examining hairs, made a submissible case.

We note, first, that the State and Judge Lowenstein rely on evidence which they say shows that Mr. Butler's general description "fit the defendant." While we agree that the boys' varying descriptions of their assailant do not exclude Mr. Butler, and that the jury was free to find that Mr. Butler matched these descriptions, we disagree with the implication of Judge Lowenstein's opinion that this description evidence specifically described Mr. Butler in particular, or that it went a long way toward convicting him. The boys' description basically described every average white male who lived in or near the trailer park: a white male between 20 and 30 years old, described as being of average weight and between five feet seven and five feet ten inches tall. Moreover, J.L. had described their assailant as having brown curly hair that extended past a baseball cap in the front, whereas it is undisputed that Mr. Butler did not have curly brown hair, but rather straight brown hair, with a severely receding hairline. His hair simply did not match the description given of the perpetrator's hair. Similarly, there was no evidence that Mr. Butler had a boat in the boat storage area or a combination to it. Thus, the reason for the significance to Judge Lowenstein of the fact that the perpetrator apparently had a boat and the combination to the boat storage area is, at best, elusive.

However, assuming that the jury resolved all inferences against Mr. Butler, and assuming that the jury ignored the hair description evidence and determined that the boys' description of the perpetrator was sufficiently similar to that of Mr. Butler so as not to exclude him as the perpetrator, this type of general description evidence is, of course, not sufficient to sustain the conviction, particularly where, as here, when confronted with Mr. Butler, neither boy could identify either him or his voice. *See Velarde v. People*, 179 Colo. 207, 500 P.2d 125, 126 (1972) (evidenced that defendant had physical makeup similar to witness' general description of perpetrator, without more, was insufficient

to link defendant to the crime and sustain the conviction).

Judge Lowenstein also relies on the evidence that Mr. Butler lived in the mobile home park where the boys lived and in which the crime was committed, and so, according to his own testimony, was familiar with the general area where the crime was committed, and in fact had been swimming at the pool near the boat storage area six hours before the crime occurred.[3] Judge Lowenstein then suggests that the fact that Mr. Butler offered a hypothesis of his innocence and recalled details of his activities the day of the crime shows his "overall plan to lie to conceal his guilt" and "gives rise to an inference of guilty knowledge." Specifically, Mr. Butler testified that he swam in the mobile home park's pool on the day of the incident. Mr. Butler remembered seeing someone who looked like J.L. get a cut on his forehead after roughhousing at the pool that day. According to Mr. Butler, everyone who used the pool put their towels in a common area by the pool, and his towel may have been in the same area as the towel of the boy who resembled J.L. On cross-examination, Mr. Butler testified that he was offering this evidence as a possible explanation for how the two hairs, which were microscopically indistinguishable from his, were found on J.L.'s clothing, since he could think of no other explanation for their presence.

In support of the contention that Mr. Butler's testimony was a lie to conceal his guilt, which created a reasonable inference of guilt, Judge Lowenstein cites *State v. Chaney*, 967 S.W.2d 47, 53 (Mo. banc 1998). The defendant in *Chaney* was charged with first degree murder. He testified regarding his whereabouts on the evening of the victim's disappearance. His testimony was inconsistent with statements he had made before trial to police, neighbors, and his wife. When confronted with the inconsistencies, the defendant denied making inconsistent statements and explained that all of the other witnesses were mistaken. The Court stated that "[a]s the trier of fact, the jury was entitled to believe that his shifting explanations, coupled with his inability to corroborate his whereabouts during the critical time period, were part of an overall plan to lie to conceal his guilt." *Id.*

*Chaney* is easily distinguishable from this case. First, the fact that Mr. Butler had knowledge of the mobile home park *in which he lived,* and used the swimming pool in *his own* mobile home park on the day of the incident, six hours prior to the incident, can hardly be said to carry the same significance as a defendant's being present at the scene of a burglary and stealing, at the time the crime was committed, and in possession of the stolen property. Similarly, Mr. Butler's testimony regarding his memory of being at the mobile home park pool, where everyone throws their towels in a pile at one end of the pool, on the day of the incident, and of seeing someone there who looked like J.L., hardly evidences "an overall plan to lie to conceal his guilt." Mr. Butler offered his testimony as a possible explanation for the presence of the two hairs on J.L.'s clothing which were microscopically indistinguishable from his hair, should it be that the hairs were in fact his. Judge Lowenstein's theory that an innocent person would not try to explain away incriminating evidence ignores the fact that the State would have been entitled to comment on Mr. Butler's failure to offer an explanation had he not done so. *State v. Simmons,* 955 S.W.2d 752, 764 (Mo. banc 1997). We also simply disagree that an innocent person would not try to think of some way his hair could have been found on the victim. To the contrary, the very fact that the innocent person knows that he is not the culprit

---

**3.** Mr. Butler testified that he was swimming until 3:00 p.m. that day. A police officer arrived at J.L.'s residence at 10:24 p.m., which was about ten minutes after J.L. arrived home. J.L. ran directly home after the assailant untied him, so it was between 9:30 to 10:15 p.m., approximately, when the boys had contact with the assailant.

would cause that person to presume that *if* that hair is his, it must have gotten on the victim some other way. He thus thinks of the only ways this could have occurred. It is not clear what about this thought process is supposed to be incriminatory. In any event, while we agree that this evidence was relevant and admissible, and that it's credibility was for the jury to determine, none of the evidence was inconsistent with his innocence.[4]

We further note that, while Judge Lowenstein argues that Mr. Butler's testimony that his hairs could have been transferred to J.L.'s clothing because all the towels of people using the pool were thrown together was a lie to conceal his guilt, it accepts as true Mr. Butler's testimony that he and J.L. were both at the pool earlier in the day the crime was committed and argues that this fact can be used to infer Mr. Butler's guilt. "While we are to accept as true all inferences favorable to the State, they must be *logical* inferences that may be reasonably drawn from the evidence." *State v. Friend,* 936 S.W.2d 824, 828 (Mo. App.1996).

But, assuming that the jury could have found the variances in Mr. Butler's hypotheses as to how the hairs could have been transferred to J.L. to be evidence of his guilt, it is not sufficient, when added to the other competent evidence, to support a finding that he was guilty beyond a reasonable doubt. The only evidence implicating Mr. Butler in the crimes charged is circumstantial evidence that Mr. Butler's head and public hairs match those found on J.L.'s clothing, that Mr. Butler was a resident of the mobile home park and used its pool, that his trailer was within walking distance of the crime scene, and that he was a white man of arguably average height and weight. Against his identification is the fact, testified to by Ms. Duvenci, that such hair comparison evidence may not be used to identify a particular individual, that there may be many white men of average height at the trailer park, that his hair style was not like that of the assailant in that it was straight and severely receding, not curly and extending over his forehead, and he had a mustache, and there was no evidence he had a boat or a combination to the lock to the boat storage area. While the evidence, considered as a whole, could raise a suspicion or conjecture that Mr. Butler was the perpetrator of the crimes against J.L. and N.E., it does not provide a reasonable juror with a basis to find him guilty beyond a reasonable doubt. *See Stallings,* 334 S.E.2d at 486–87.[5]

Here, unlike the cases cited by Judge Lowenstein, the *other* evidence was simply

4. This thus distinguishes this case from cases such as *State v. Benfield,* 522 S.W.2d 830, 833 (Mo.App.1975). *Benfield* held that defendant's "unexplained possession of property recently stolen in a burglary," along with his presence at the scene when the burglary and stealing occurred, his opportunity to commit the crimes, as well as the fact that he was seen leaving the crime scene with the stolen property, constituted "facts and circumstances which not only prove appellant's guilt but are also inconsistent with his innocence." *Id.* Here, Mr. Butler's knowledge about his own mobile home park and his own activities is not inconsistent with his innocence.

5. By finding that the circumstantial evidence in this case does not prove Mr. Butler's guilt beyond a reasonable doubt, this Court would not run afoul of *State v. Grim,* 854 S.W.2d 403 (Mo. banc 1993). In *Grim,* the Supreme Court held that circumstantial evidence is sufficient to sustain a guilty verdict and that no greater quantum of proof is required to support a conviction based on such circumstantial evidence. *Id.* at 406. The difference between *Grim* and this case, however, is that in *Grim,* the circumstantial evidence of defendant's guilt was a bloody fingerprint which was made in the victim's blood. *Id.* at 412. Because of the reliable and unique quality of an individual's fingerprint, fingerprint evidence, alone, is sufficient to support a criminal conviction. *Bland,* 757 S.W.2d at 245–46; *State v. Anderson,* 671 S.W.2d 383, 385 (Mo. App.1984). But, as has already been noted, hair comparison evidence is not nearly as reliable as fingerprint evidence. Affirming a criminal conviction on unreliable and inconclusive circumstantial evidence would be affirming a conviction supported by less than proof beyond reasonable doubt, which *Grim* clearly prohibits as well. 854 S.W.2d at 408.

insufficient to allow the jury to identify Defendant. For these reasons, the dissenting judges would hold that the State failed to make a submissible case, in that the evidence was insufficient to support a finding by a reasonable juror that Mr. Butler was guilty beyond a reasonable doubt, and would reverse his conviction.

JOSEPH M. ELLIS, Judge, dissenting.

I concur in the ably written and tightly reasoned dissenting opinion of Judge Stith. I write separately merely to state that if Judge Breckenridge were correct in her view that *Callahan* v. *Cardinal Glennon Hosp.*, 863 S.W.2d 852 (Mo. banc 1993) was overruled *sub silencio* by *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611 (Mo. banc 1995), and Mr. Butler's conviction must therefore stand, it would become an inescapable fact that Mr. Butler received ineffective assistance of trial counsel. Defense counsel acknowledged that he did not object to Ms. Duvenci's testimony as a matter of trial strategy. As demonstrated by Judge Stith's dissenting opinion and Judge Breckenridge's concurring opinion, but for such unsound trial strategy, Mr. Butler could not have been convicted. Accordingly, defense counsel's trial strategy would not have conformed to the degree of skill, care and diligence of a reasonably competent attorney, and Mr. Butler would clearly have been prejudiced thereby. *State v. Colbert*, 949 S.W.2d 932, 940 (Mo.App. W.D.1997).